BERNARD TUDOR, PLAINTIFF-APPELLANT, v. BOARD OF EDUCATION OF THE BOROUGH OF RUTHERFORD, DEFENDANT-RESPONDENT, THE GIDEONS INTERNATIONAL, A CORPORATION OF ILLINOIS, INTERVENOR-RESPONDENT.

Argued October 5, 1953—Decided December 7, 1953.

32

*Mr. Leo Pfeffer* (of the New York Bar) argued the cause for the appellant (*Mr. Archibald Kreiger,* attorney).

*Mr. Jacob Stam* argued the cause for the respondents (*Messrs. Kipp, Ashen and Somerville,* attorneys for respondent Board of Education; *Mr. W. Adriance Kipp, Jr.,* of counsel with both respondents).

. A brief *amici curiae* was filed by the Synagogue Council of America and the National Community Relations Advisory

Council (*Mr. Harry Silverstein*, attorney, *Messrs. Philip Baum* and *Joseph B. Robison*, of the New York Bar, of counsel).

The opinion of the court was delivered by
VANDERBILT, C. J.

## I.

The Gideons International is a nonprofit corporation organized under the laws of the State of Illinois, whose object is "to win men and women for the Lord Jesus Christ, through * * * (c) placing the Bible—God's Holy Words—or portions thereof in hotels, hospitals, schools, institutions, and also through the distribution of same for personal use." In recent years it began a campaign to make available to pupils in the public schools of this country the so-called "Gideon Bible," which was characterized by the International in its pleadings as "a book containing all of the New Testament, all of the Book of Psalms from the Old Testament, all of the Book of Proverbs from the Old Testament; all without note or comment, conformable to the edition of 1611, commonly known as the Authorized, or King James version of the Holy Bible." In furtherance of this campaign it applied by letter to the Board of Education of the Borough of Rutherford for permission to distribute its Bible to the public schools of that municipality: • ▪ ▪

"Board of Education
Rutherford, N. J.

Attention: Mr. Guy Hilleboe

Gentlemen:

The Gideons of Passaic and Bergen County, consisting of local business men, hereby offer to furnish, without charge, a volume containing the book of Psalms, Proverbs and the New Testament to each of the children in the schools of Rutherford from the fifth grade up through the eighth grade, and High School.

This offer is part of a national campaign conducted by the Gideons International to furnish the Word of God free to the young people

of our country from the fifth grade through the high school. If God's word is heard and heeded, if it is read and believed, we believe that this is the answer to the problem of juvenile delinquency.

If your board approves this distribution, we will be glad to have our committee work out the details with the principals of the schools.

Yours very truly,

PASSAIC COUNTY CAMP OF GIDEONS<br>/s/John Van Der Eems,<br>John Van Der Eems,<br>Treasurer"

The proposal was considered at a meeting of the board of education on November 5, 1951, at which time there was voiced some opposition to the proposal by a Catholic priest and a Jewish rabbi on the grounds that the Gideons' New Testament was sectarian and forbidden to Catholic and Jewish children under the laws of their respective religions. The proposal, however, was passed by the board with one dissenting vote, the resolution adopted providing that "the Gideons International be allowed to furnish copies of the New Testament, Psalms and Proverbs to those pupils who request them." Under date of November 21, 1951 the following request form for signature of the parents was prepared by the board of education and distributed to the pupils of the public schools of Rutherford:

"Rutherford Pubilc Schools,<br>Rutherford, N. J.<br>November 21, 1951

To all Parents:

At the regular meeting of the Board of Education on November 5, 1951, The Gideon Bible Society, presented a request that the New Testament, Psalms and Proverbs be made available, without cost, to all children who wish a copy. The Board approved this request provided the distribution be voluntary. *If you wish a copy of this Bible, will you please sign the slip below and return it with your child to the school he attends by Friday, December 21.*

........................................................

School ..........................        ........................
Date

Please request The Gideon Bible Society to provide my child ..............................., with a copy of the New

Testament, Psalms and Proverbs. This request involved no obligation on my part or on the part of the Board of Education.

Signed..........................................
Parent or Guardian"

On January 14, 1952 the board of education was advised by its counsel that the proposed distribution was in his opinion legal. At a principal's meeting on February 6, 1952 the following instructions were issued:

"(a) Only names of pupils whose parents had previously signed for the Bibles should be used in any announcement.

(b) Pupils whose parents had signed for Bibles are to report to the home room at the close of the session and no other pupils are to be in the room when the Bibles are distributed.

(c) Any announcement of names for the purpose of reporting after school should not include a reference as to the purpose of reporting."

Prior to the distribution of the books the present action was commenced demanding judgment as to the validity of the distribution under the Federal and New Jersey Constitutions and seeking an injunction against it. On February 19, 1952 the trial judge granted a temporary injunction and by order dated February 29, 1952 restrained the board of education from carrying out the terms of its resolution of December 10, 1951, until further determination of the action. By consent Gideons International was permitted to intervene as a party defendant. After a full hearing the trial judge on March 30, 1953 found in favor of the defendant and vacated the restraint and stay. By consent of the parties, however, the stay has been continued pending appeal. While the appeal was before the Appellate Division of the Superior Court, we ordered certification on our own motion.

The plaintiff Bernard Tudor is an adherent of the Jewish religion, while plaintiff. Ralph Lecoque is a member of the Catholic faith, each being a New Jersey citizen and taxpayer of Rutherford and a parent of a pupil in a Rutherford public school. Each contends that the Gideon Bible is "a sectarian work of peculiar religious value and significance to members of the Protestant faith." Mr. Tudor claiming that "its distribution to children of the Jewish faith violates the

teachings, tenets and principles of Judaism," while Mr. Lecoque states that "its distribution to children of Catholic faith violates the teachings, tenets and principles of Catholicism." After this action was commenced, the child of plaintiff Ralph Lecoque transferred from the public school to a Catholic parochial school and to the extent that the complaint was based upon his status as a parent, the issue became moot. The State of New Jersey was originally named as a party defendant but the action as to it has been dismissed. The Synagogue Council of America and the National Community Relations Advisory Council have submitted a brief *amici curiae.*

## II.

The American doctrine of the separation of Church and State cannot be understood apart from its history for it is the epitome of centuries of struggle and conflict. In 311 A. D. Christians were still being persecuted; but shortly thereafter the Fourth Century witnessed the toleration of Christianity in the Roman world. In 313 A. D. Constantine, the ruler of the West, and Licinius, the emperor of the East, met in Italy and proclaimed the Edict of Milan, which made the toleration of the Christian religion "a part of a universal toleration of all religions, and it establishes absolute freedom of worship," *Innes, Church and State, p.* 23. In 410 A. D. Rome was sacked by Alaric. Italy, as well as Spain and Africa, fell to the Teutonic barbarians, but these conquests did not spell defeat for Christianity. The attitude of the invaders is illustrated by the words of Theodoric, speaking shortly after the fall of Rome:

"That to pretend to a dominion over the conscience is to usurp the prerogative of God; that by the nature of things the power of sovereigns is confined to external government; that they have no right of punishment, but over those who disturb the public peace, of which they are the guardians; and that the most dangerous heresy is that of a sovereign who separates himself from a part of his subjects, because they believe not according to his belief." *Innes, Church and State, p.* 51.

After the collapse of the Roman Empire the Church remained as the one stable, permanent element in society. Gradually it came to claim not merely equality with the State, but actual superiority. Thomas Aquinas summed up the Church's attitude:

"The highest aim of mankind is eternal happiness. To this chief aim of mankind all earthly aims must be subordinated. This chief aim cannot be realized through human direction alone but must obtain divine assistance which is only to be obtained through the Church. Therefore the State, through which earthly aims are obtained, must be subordinated to the Church. Church and State are as two swords which God has given to Christendom for protection; both of these, however, are given by him to the Pope and the temporal sword by him handed to the rulers of the State." *Bates, Religious Liberty: An Inquiry* (1945), *p.* 140.

The Church's claim of supremacy did not go unchallenged. Charlemagne, who had been crowned by the Pope, deliberately crowned his own son as successor without consulting the Pope. The struggle for supremacy was on between Church and State, and the history of the Middle Ages in Europe is largely a history of this continuing conflict. The struggles between Pope Gregory VII and Emperor Henry IV in the 11th Century, and between the English kings Henry II and John and Celestine III and Innocent III a century later were but phases of the conflict. The Church reached the height of its supremacy over the State in the 13th Century, under Innocent III, who informed the Patriarch of Constantinople that "the Lord left to Peter (the Pope) the government not of the Church only but of the whole world," and advised Philip Augustus of France that "single rulers have single provinces and single kings have single kingdoms, but Peter, as in the plentitude, so in the extent of his power, is preeminent over all since he is the vicar of Him Whose is the earth and fullness thereof, the whole world and all that dwell therein." *Bates, Religious Liberty: An Inquiry, supra, pp.* 140–141. During his rule Innocent was not only a spiritual leader but he was also the supreme temporal chief of the Italian State, the Spanish Peninsula, the Scandinavian States, Hungary, Bohemia, Poland, Servia, Bosnia,

Bulgaria, and the Christian state of Syria, 17 *Encyclopædia Britannica* (14*th* ed.), "Papacy," *p.* 203.

The 14th Century witnessed the growth of new ideas. In 1324 Marsilius of Padua in his *Defensor Pacis* denied the right of the Church to interfere in any matters which were not spiritual. He expounded the very ideas that centuries later were credited to Locke, Montesquieu, Rousseau and Jefferson. Marsilius was far ahead of his age when he claimed that "no man may be punished for his religion." *Acton, History of Freedom in Christianity,* in *Essays on Freedom and Power, p.* 65.

But the doctrine of religious liberty and the separation of Church and State were not established in Europe even with the advent of the Reformation. The Reformation brought forth the more prevalent Erastian doctrine of state supremacy and the use of religion to help carry out state policy. The peace of Augsburg in 1555 was a compromise between Lutherans and Catholics, based on the theory that the religion of a province was to be determined by the religion of its ruler (*cuius regio, eius religio*). To the same effect was the peace of Westphalia in 1648 ending a 30-year religious war which swept Central Europe:

"Each secular state in Germany was henceforth free to profess its existing religion, whether Catholic, Lutheran, or Reformed; but no other religion was to be 'received or tolerated in the Holy Roman Empire,' and the power of the reigning princes to 'reform' their states by driving out dissenters was restrained rather than abolished." *Innes, Church and State, p.* 157.

In England under Queen Elizabeth the Thirty-nine Articles of the Church of England were adopted and the supremacy of the Crown over the Church was clearly established. Bloody struggles between Anglicans, Catholics and Dissenters continued. By the 17th Century Catholics were regarded with disfavor and in 1647 the Constitution established by Cromwell granted religious freedom to all except Catholics. In the Glorious Revolution of 1689 the Act of Toleration under William and Mary established religious toleration in England, but again Catholics were excepted.

By 1787 in Europe no nation had established complete freedom of worship or the mutual independence of religion and civil government. There had been steps in that direction and there were those who strongly advocated the separation of Church and State but the Erastian doctrine still prevailed. In almost every country there was a state-supported or at least a state-favored religion while the other faiths. were treated with varying degrees of toleration. In Spain the Inquisition was still in existence in 1787 while at the other extreme Holland represented the utmost in religious toleration and freedom for all faiths. In 1784 James Madison summed up the centuries of bloody religious battles in Europe:

"Torrents of blood have been spilt in the world in vain attempts of the secular arm to extinguish religious discord, by proscribing all differences in religious opinions." *Blau, Cornerstones of Religious Freedom in America* (1949), *p.* 85.

While America has been free from religious wars, our history has had its dark pages of religious persecution.

### III.

Religion was a strong motivating force in the American colonies. People of all faiths flocked to the New World, many with the hope that here for the first time they could enjoy religious freedom. Unfortunately to America these earlier settlers also brought the Old World idea of a state-established and state-dominated religion. Many of the original charters granted by the Crown required the settlers to establish a religion that was to be supported by all, believers and nonbelievers alike. Thus, in early Virginia all ministers were required to conform to the canons of the Church of England. Quakers were banished and Catholics were disqualified from public office, while priests were not permitted in the colony. In New York Peter Stuyvesant established the Dutch Reformed Church, which all settlers were required to support. Baptists who attempted to hold services in their

homes were subject to fines, whipping and banishment. Quakers were unwelcome and subject to persecution. The Commission of New Hampshire of 1680 provided:

"And above all things We do by these presents will, require and command our said Council to take all possible care for ye discountenancing of vice and encouraging of virtue and good living; and that by such examples ye infidle may be invited and desire to partake of ye Christian Religion, and for ye greater ease and satisfaction of ye sd loving subjects in matters of religion, We do hereby require and command yt liberty of conscience shall be allowed unto all protestants; yt such especially as shall be conformable to ye rites of ye Church of Engld shall be particularly countenanced and encouraged." 2 *Poore, Constitutions* (1878), *p.* 1277.

In New England generally the Calvinist Congregational Church was the established religion.

Religious freedom in the colonies was far from an established fact. In the Massachusetts Bay Colony Anne Hutchinson in 1638 was tried and convicted as a blasphemer and seducer of the faithful and as a teacher of erroneous doctrines, because she held meetings in her home where she advocated the direct intuition of God's grace and love instead of obedience to the laws of the Church and the State. Roger Williams was banished because "he broached and divulged divers new and dangerous opinions, against the authority of the magistrates," 1 *Stokes, Church and State in the United States* (1950), *p.* 195. Catholics were persecuted and in 1647 the General Court ordered that:

"No Jesuit or spiritual or ecclesiastical person ordained by the pope or see of · Rome shall henceforth come into Massachusetts. Any person not freeing himself of suspicion shall be jailed, then banished. If taken a second time he shall be put to death." *Pfeffer, Church, State and Freedom* (1953), *p.* 68.

Despite these instances of intolerance and persecution there were successful examples of religious freedom. In 1649, largely due to the efforts of Cecil Calvert, the second Lord Baltimore, Maryland granted toleration to all Trinitarian Christians. In Rhode Island through the efforts of John

Clarke, a follower of Roger Williams, Charles II granted a charter in 1663 which provided for complete religious freedom. In 1683 Pennsylvania received from William Penn its "Frame of Government" which stated that all who believed in "One Almighty God" should be protected and all who believed in "Jesus Christ the Savior of the World" could hold civil office.

The history of religious freedom in the province of New Jersey was not fundamentally different from that in the other colonies, although Stokes states that we "had a better colonial record in the matter of toleration than most of the colonies," 1 *Church and State in the United States, supra, p.* 435. The grantees of the Concessions of 1665, Lord Berkeley and Sir George Carteret, offered liberty of worship as an inducement to settlers. This was continued under the Quakers by a law of 1681 in West Jersey and in East Jersey by a law of 1683. Nevertheless, despite what appeared to be the establishment of religious freedom in the Province of New Jersey, *Leaming and Spicer, Grants and Concessions of New Jersey,* 1664–1702 (*2nd ed.* 1881, *p.* 14), there was strong anti-Catholic feeling in the colony, and holders of civil office were required to take an oath against the Pope, *Ibid. p.* 92. By the king's instructions to Lord Cornbury (*Ibid., p.* 633) in 1702 he was to permit a liberty of conscience to all persons except Papists. Our Constitution of 1776 provides:

"XVIII. Free Exercise of religion.

"That no person shall ever within this colony be deprived of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatsoever, compelled to attend any place of worship, contrary to his own faith and judgment; nor shall any person within this colony, ever be obliged to pay tithes, taxes or any other rates, for the purpose of building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right, or has deliberately or voluntarily engaged himself to perform."

But the very next article of this same Constitution, after providing that there shall be "no establishment of any one

religious sect in this province in preference to another," goes
on to guarantee civil rights and the right to hold office to all
who are of the "protestant sect." The exclusion of Catholics
from this guarantee of civil rights and from holding civil
office was not eliminated until the Constitution of 1844.

Generally speaking, it can then be said that religious
toleration varied from one province to another with very few
approaching a system of full religious freedom. Pfeffer
reviews the religious atmosphere in the colonies:

"Summarizing the colonial period, we may note that the pro-
prietary regimes permitted a considerable degree of toleration, at
least in comparison with the other colonies. This difference may
be explained partly by the idealism of the proprietors and partly
by the economic necessity of attracting large numbers of settlers in
order to preserve and make profitable the proprietor's substantial
investment.

Even in the proprietary colonies, however, the death of the
idealistic founder, Calvert, Williams, or Penn, resulted in con-
siderable backsliding, and the imposition of restrictions on civil
and religious rights, particularly of non-Protestants. The limited
tolerance which did exist did not include Catholics, Jews, Unitarians,
or Deists. The variety and degree of discrimination against them
varied. Primarily, the discrimination was political—the non-
Protestants could not vote or hold office. But the restrictions
were not always limited to political disabilities. Public performance
of Catholic worship was prohibited almost everywhere, and as late
as 1756 the colony which had been founded by the Catholic Cal-
verts enacted a law subjecting Catholics to double taxation. Per-
haps the incident that most ironically illustrates the turnabout
after the death of the idealistic founder is the action of a Rhode
Island court which in 1762 denied the petition of two Jews for
naturalization on the ground that to grant the petition would be
'inconsistent with the first principles on which the colony was
founded.'" *Church, State and Freedom, supra, p.* 79.

It was left to Virginia to lead the struggle for religious
freedom and the separation of Church and State. In 1784
there was proposed in its House of Delegates a "bill estab-
lishing provision for teachers of the Christian religions."
Action thereon was postponed until the next session in
order that the bill could be publicized and distributed to the
people who could then make known their views. The issue
was fought on a very high plane of principle with Thomas

Jefferson, James Madison and George Mason aligned with the opposition. It was then that James Madison wrote his famous *A Memorial and Remonstrance* in which he presented his views that religion was not a matter within the scope of civil government. For complete historical background and full text reference is made to Mr. Justice Rutledge's dissenting opinion in *Everson v. Board of Education*, 330 *U. S.* 1, 28, 67 *S. Ct.* 504, 91 *L. Ed.* 711, 730 (1947). At the next session the proposed bill was defeated and in its place an act "for establishing religious freedom" drafted by Thomas Jefferson was passed, the preamble of which stated: "that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty." The bill further provided "that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order." In his opinion for the court in *Reynolds v. United States*, 98 *U. S.* 145, 163, 25 *L. Ed.* 244, 248 (1879), Mr. Chief Justice Waite states that "in these two sentences is found the true distinction between what properly belongs to the Church and what to the State."

It was a little over a year later that the Convention met in Philadelphia to draft the Constitution of the United States. The Convention failed to include in the proposed Constitution any Bill of Rights or any provision concerning freedom of religion. Although adopting the Constitution, several states did so only on the understanding that a Bill of Rights would be added including a provision for a declaration of religious liberty. At the very first session of Congress the first ten amendments, or Bill of Rights, were proposed and largely through the efforts of James Madison were adopted, the First Amendment providing that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." It took us over 14 centuries and an incalculable amount of persecution to gain the religious

tolerance and freedom expounded in 313 A. D. by the rulers of the Roman world.

The First Amendment, of course, applied only to the Federal Government, but it has been held that upon the adoption of the Fourteenth Amendment the prohibitions of the First Amendment were applicable to state action bridging religious freedom, *Cantwell v. State of Connecticut*, 310 U. S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213, 1217 (1940).

## IV.

The charge here is sectarianism. The defendant board of education is accused of showing a preference by permitting the distribution of the King James version of the New Testament, which is unacceptable to those of the Jewish faith and, in fact, in conflict with their tenets. This violates the mandate of the First Amendment, as incorporated into the Fourteenth Amendment, prohibiting the making of any law "respecting an establishment of religion," and the requirement of Article I, paragraph 4 of the New Jersey Constitution that "there shall be no establishment of one religious sect, in preference to another." By its very terms the New Jersey constitutional provision prohibits any such religious preference, while the First Amendment to the Federal Constitution has been judicially interpreted as so providing. As stated by Mr. Justice Black in his opinion for the majority of the court in *Everson v. Board of Education, supra,* 330 U. S. 1, 15, 67 S. Ct. 504, 91 L. Ed. 711:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. * * *

That Amendment [First] requires the state to be a neutral in its relations with groups of religious believers and non-believers." (330 U. S. at *page* 18, 67 S. Ct. at *page* 511.)

In *Zorach v. Clauson*, 343 U. S. 306, 314, 72 S. Ct. 679, 684, 96 L. Ed. 954, 962 (1952), Mr. Justice Douglas in his opinion for the majority of the court stated:

"The government must be neutral when it comes to competition between sects."

In *Fowler v. State of Rhode Island,* 345 *U. S.* 67, 69, 73 *S. Ct.* 526, 527, 97 *L. Ed.* 828 (1953), a minister of Jehovah's Witnesses was convicted in the state court for violation of a municipal ordinance prohibiting the addressing of a religious meeting in a public park. The evidence showed that the ordinance had not been construed to prohibit church services of Catholics and Protestants. The court set aside the conviction, saying:

"For it plainly shows that a religious service of Jehovah's Witnesses is treated differently than a religious service of other sects. That amounts to the state preferring some religious groups over this one."

We are well aware of the ever continuing debates that have been taking place in this country for many years as to the meaning which should be given to the First Amendment. There are those who contend that our forefathers never intended to erect a "wall of separation" between Church and State. On the other hand, there are those who insist upon this absolute separation between Church and State. The plaudits and the criticisms of the various majority, concurring, and dissenting opinions rendered by the United States Supreme Court in *Everson v. Board of Education, supra,* 330 *U. S.* 1, 67 *S. Ct.* 504, 91 *L. Ed.* 711; *People of State of Illinois ex rel. McCollum v. Board of Education,* 333 *U. S.* 203, 68 *S. Ct.* 461, 92 *L. Ed.* 648 (1948), and *Zorach v. Clauson, supra,* 343 *U. S.* 306, 72 *S. Ct.* 679, 96 *L. Ed.* 954, still continue.

But regardless of what our views on this fundamental question may be, our decision in this case must be based upon the undoubted doctrine of both the Federal Constitution and our New Jersey Constitution, that the state or any instrumentality thereof cannot under any circumstances show a preference for one religion over another. Such favoritism cannot be tolerated and must be disapproved as a clear violation of the Bill of Rights of our Constitutions.

This brings us to the heart of our problem here—namely, whether the resolution of the board of education displays that favoritism that is repugnant to our Constitutions. By permitting the distribution of the Gideon Bible, has the board of education established one religious sect in preference to another? Although as to the Catholic plaintiff this action has become moot due to the withdrawal of his child from the public schools of Rutherford, some testimony was presented at the trial as to his claim of sectarianism so we will at times refer to such testimony in our opinion. Our decision, however, is based upon the claim of the Jewish plaintiff that the resolution of the Rutherford Board of Education constitutes a preference of one religion over the Hebrew faith.

A review of the testimony at the trial convinces us that the King James version or Gideon Bible is unacceptable to those of the Jewish faith. In this regard Rabbi Joachim Prinz testified:

"The New Testament is in profound conflict with the basic principles of Judaism. It is not accepted by the Jewish people as a sacred book. The Bible of the Jewish people is the Old Testament. The New Testament is not recognized as part of the Bible. The teachings of the New Testament are in complete and profound conflict with what Judaism teaches. It presupposes the concept of Jesus of Nazareth as a divinity, a concept which we do not accept."

"They are in complete and utter conflict with what we teach, for we teach the oneness of God, which to our—and in accordance with our belief, excludes the existence of a Son of God. We accept Jesus of Nazareth as one of the figures of Jewish history, a Jew born, a Jew, died as a Jew, but we do not accept Jesus of Nazareth as the Christ. * * *

No, it is certainly not a nonsectarian book. It is a book that is— expresses the view of one denomination among the many religious denominations of the world." * * *

Dr. Bernard J. Bamberger, rabbi of the West End Synagogue in New York City and former president of the Synagogue Council of America, stated:

"Well, the New Testament, of course, is itself a complex document which contains a great many different writings, and so forth. Some of the passages and some of those writings are in themselves

not necessarily in conflict with Judaism, but a very great many of them are in conflict with Judaism, first, because they teach certain doctrines which are contradictory to doctrines taught by Judaism, and also because in certain passages the New Testament writers directly attack certain Jewish beliefs which are very sacred to Jews."

He concluded that the King James Version was "completely not a nonsectarian book." Rabbi Irving Schnipper, in answer to a question whether the teachings of the New Testament are in conflict with his teaching of the children of the plaintiff Bernard Tudor, testified:

"Definitely, the New Testament itself is in direct opposition to the teachings of Judaism."

Nor is there any doubt that the King James version of the Bible is as unacceptable to Catholics as the Douay version is to Protestants. According to the testimony in this case the canon law of the Catholic Church provides that "Editions of the original test of the sacred scriptures published by non-Catholics are forbidden *ipso jure.*"

The defendant refers us to various statements by legal scholars and others to show that the Bible is not sectarian, but rather is the universal book of the Christian world, but in many of these statements the question of the New Testament was not discussed. In *Doremus v. Board of Education of Borough of Hawthorne,* 5 *N. J.* 435 (1950), appeal dismissed 342 *U. S.* 429, 72 *S. Ct.* 394, 96 *L. Ed.* 475 (1952), relied on by the defendant, the issue was whether *R. S.* 18:14–77 and 78, providing for compulsory reading in the public schools of five verses of the Old Testament and permissive reading of the Lord's Prayer violated the Federal Constitution. In upholding the constitutionality of the statutes we specifically stated 5 *N. J.,* at *page* 453:

"We consider that the Old Testament and the Lord's Prayer, pronounced without comment, are not sectarian, and that the short exercise provided by the statute does not constitute sectarian instruction or sectarian worship * * *."

We adhere to the *Doremus* case, but its holding does not apply here, where clearly the issue of sectarianism is present. Here the issue is the distribution of the New Testament. The uncontradicted evidence presented by the plaintiff reveals that as far as the Jewish faith is concerned, the Gideon Bible is a sectarian book, the teachings of which are in conflict with the doctrines of his religion as well as that of his child, who is a pupil in the Rutherford public school. The full force of the violation of both the State and Federal Constitutions is revealed when we perceive what might happen if a single school board were besieged by three separate applications for the distribution of Bibles—one from Protestants as here, another from Catholics for the distribution of the Douay Bible, and a third from Jews for the same privilege for their Bible.

We find from the evidence presented in this case that the Gideon Bible is a sectarian book, and that the resolution of the defendant board of education to permit its distribution through the public school system of the Borough of Rutherford was in violation of the First Amendment of the United States Constitution, as incorporated into the Fourteenth Amendment, and of Article I, paragraph 4, of the New Jersey Constitution. It therefore must be set aside.

## V.

The defendant contends that the distribution of the Gideon Bible in no way injects any issue of the "free exercise" of religion, that "no one is forced to take a New Testament and no religious exercise or instrument is brought to the classrooms of the public schools." In other words, it asserts the arguments of *Zorach v. Clauson, supra,* 343 *U. S.* 306, 315, 72 *S. Ct.* 679, 96 *L. Ed.* 954, that the "accommodation" of religion is permissible. This argument, however, ignores the realities of life. In his concurring opinion joined in by three other members of the Court, Mr. Justice Frankfurter stated in *People of State of Illinois*

ex rel. McCollum v. Board of Education, supra, 333 U. S. 203, 227, 68 S. Ct. 461, 473, 92 L. Ed. 648:

"Religious education so conducted on school time and property is patently woven into the working scheme of the school. The Champaign arrangement thus presents powerful elements of inherent pressure by the school system in the interests of religious sects. The fact that this power has not been used to discriminate is beside the point. Separation is a requirement to abstain from fusing functions of Government and of religious sects, not merely to treat them all equally. That a child is offered an alternative may reduce the constraint; it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and non-conformity is not an outstanding characteristic of children. The result is an obvious pressure upon children to attend. Again, while the Champaign school population represents only a fraction of the more than two hundred and fifty sects of the nation, not even all the practicing sects in Champaign are willing or able to provide religious instruction. The children belonging to these non-participating sects will thus have inculcated in them a feeling of separatism when the school should be the training ground for habits of community, or they will have religious instruction in a faith which is not that of their parents. As a result, the public school system of Champaign actively furthers inculcation in the religious tenets of some faiths, and in the process sharpens the consciousness of religious differences at least among some of the children committed to its care. These are consequences not amenable to statistics. But they are precisely the consequences against which the Constitution was directed when it prohibited the Government common to all from becoming embroiled, however innocently, in the destructive religious conflicts of which the history of even this country records some dark pages."

In State ex rel. Weiss v. District Board, 76 Wis. 177, 44 N. W. 967, 7 L. R. A. 330 (Sup. Ct. 1890), it was stated:

"When * * * a small minority of the pupils in the public school is excluded, for any cause, from a stated school exercise, particularly when such cause is apparent hostility to the Bible which a majority of the pupils have been taught to revere, from that moment the excluded pupil loses caste with his fellows, and is liable to be regarded with aversion, and subjected to reproach and insult. But it is a sufficient refutation of the argument that the practice in question tends to destroy the equality of the pupils which the constitution seeks to establish and protect, and puts a portion of them to serious disadvantage in many ways with respect to the others." (at 44 N. W. 975)

Professor Isidore Chein, Supervisor of Psychology and Acting Director of the Research Center for Mental Health at New York University, testified on behalf of the plaintiff:

"* * * I would expect that a slip of this kind, distributed under the authority of the school, would create a subtle pressure on the child which would leave him with a sense that he is not quite as free as the statement on that slip says; in other words, that he will be something of an outcast and a pariah if he does not go along with this procedure."

"* * * I think that they would be in a situation where they have to play along with this or else feel themselves to be putting themselves in a public position where they are different, where they are not the same as other people, and the whole pressure would exist on them to conform."

Dr. Dan Dodson, professor in the School of Education of New York University and director of curriculum and research in the Center for Human Relations Studies, when questioned as to the divisive effect of the distribution of the Gideon Bible stated:

"I would say that any instance of this kind in which the * * * a document that has the importance that this has to certain religious groups, including my own, would be distributed or used as a means of propaganda or indoctrination by official channels, such as the school system, would create tensions among the religious groups; there would be a controversial problem."

"I would say that it would raise questions among the children as to who is and who isn't, in terms of receiving the Bible. It would also create problems as to why some accepted it and others didn't. That would be divisive." *** 

See also *People ex rel. Ring v. Board of Education*, 245 *Ill*. 334, 92 *N. E*. 251, 29 *L. R. A., N. S*. 442 (*Sup. Ct.* 1910), where the court maintained that the fact that pupils could request to be excused from religious exercises did not make the requirement of sectarian Bible reading constitutional, and *Miller v. Cooper*, 56 *N. M*. 355, 244 *P. 2d* 520 (*Sup. Ct.* 1952), where the plaintiffs brought an action seeking, among other things, an injunction against the dissemination of allegedly sectarian literature among the public school pupils in violation of the provisions of the Federal

and State Constitutions. The court there granted this relief, saying:

"The charge [that] the defendants were using the school as a medium for the dissemination of religious pamphlets published by the Presbyterian Church presents a different situation. It is true that the teachers did not hand them to the pupils or instruct that they be taken or read. The pamphlets were, however, kept in plain sight in a school room and were available to the pupils and the supply was evidently replenished from time to time. We condemned such practice in *Zellers v. Huff, supra,* and condemn it here and hold [that] the trial court was in error when it failed to enjoin such acts * * *." (at 244 *P.* 2*d* 521)

██ We cannot accept the argument that here, as in the *Zorach* case, *supra,* the State is merely "accommodating" religion. It matters little whether the teachers themselves will distribute the Bibles or whether that will be done by members of the Gideons International. The same vice exists, that of preference of one religion over another. This is all the more obvious when we realize the motive of the Gideons. Its purpose is "to win men and women for the Lord Jesus Christ, through * * * (c) placing the Bible—God's Holy Word * * * or portions thereof in hotels, hospitals, schools, institutions, and also through distribution of same for personal use." The society is engaged in missionary work, accomplished in part by placing the King James version of the Bible in the hands of public school children throughout the United States. To achieve this end it employs the public school system as the medium of distribution. It is at the school that the pupil receives the request slip to take to his parents for signature. It is at the school that the pupil actually receives his Gideon Bible. In other words, the public school machinery is used to bring about the distribution of these Bibles to the children of Rutherford. In the eyes of the pupils and their parents the board of education has placed its stamp of approval upon this distribution and, in fact, upon the Gideon Bible itself. Dr. Dodson further testified:

"I would say it would leave a lefthanded implication that the school thought this was preferential in terms of what is the divine

word, and that the backing of the State would inevitably be interpreted as being behind it."

Dr. William Heard Kilpatrick stated:

"The Protestants would feel that the school is getting behind this thing; the Catholics would feel that the school is getting behind a Protestant affair; the Jews would feel that the school is getting behind the Protestant religion as opposed to their religion; and the people who don't accept any religion would feel that the school is actually trying to teach the religion through this means."

This is more than mere "accommodation" of religion permitted in the *Zorach* case. The school's part in this distribution is an active one and cannot be sustained on the basis of a mere assistance to religion.

We are here concerned with a vital question involving the very foundation of our civilization. Centuries ago our forefathers fought and died for the principles now contained in the Bill of Rights of the Federal and New Jersey Constitutions. It is our solemn duty to preserve these rights and to prohibit any encroachment upon them. To permit the distribution of the King James version of the Bible in the public schools of this State would be to cast aside all the progress made in the United States and throughout New Jersey in the field of religious toleration and freedom. We would be renewing the ancient struggles among the various religious faiths to the detriment of all. This we must decline to do.

The judgment below is reversed and the resolution of the Board of Education of the Borough of Rutherford under review is stricken.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.