128 So.2d 181 (1960)
Sidney BROWN, Sidney Gluckman, Samuel W. Harris, Louis Katz, Dr. Morton Levy, Avner Lewis, Dr. Gordon F. Lewis, Harry Rachtman and Dr. Rodman Shippen, on their own behalf, and in behalf of all other persons similarly situated, Appellants,
v.
ORANGE COUNTY BOARD OF PUBLIC INSTRUCTION, R. Earl Kipp, Superintendent of Public Instruction, Brantley Burcham, Hermet E. Smith, R.N. Heintselman, Mrs. G.B. Fishback and Mrs. Leslie Turner, Board Members, Appellees.
No. 2018.
District Court of Appeal of Florida. Second District.
December 23, 1960.
Jerome J. Bornstein, Orlando, for appellants.
J.R. Wells and Allen K. McCormick, Maguire, Voorhis & Wells, Orlando, for appellees.
ALLEN, Chief Judge.
The appellants filed an action in the lower court seeking declaratory and injunctive relief against the appellees as officials of the Orange County public school system, who authorized and permitted the distribution of Gideon Bibles in the public schools. The plaintiffs alleged their standing to bring this suit as taxpayers and as parents of children attending various public schools *182 in Orange County. The complaint alleged the background and nature of the Gideon Society; alleged that the distribution of the Gideon Bible is of sectarian significance to the Protestant faith but its distribution violates the tenets of plaintiffs' religious faith; and that the distribution by defendants of this book violated certain rights of the defendants under the United States and Florida Constitutions.
The Gideon organization was founded July 1, 1899, in Janesville, Wisconsin. The name "Gideon" is derived from a Bible hero who, with a small band, defeated the Midianites and ruled Israel for 40 years.
To be a Gideon requires membership in a Protestant church. Practically everyone who has travelled will remember seeing a Bible in his hotel room which was presented to the hotel by the Gideons. This Bible is the standard King James version. The Bible which is usually presented for school children is composed of the New Testament and Psalms and Proverbs of the Old Testament.
It is estimated that over four million Bibles have been donated by the Gideons since they started distributing Bibles. The Gideons, in addition to utilizing the hotels and other lodging accommodations, have used the facilities of the public school system to distribute their Bibles to school children. It is the utilization of the public school facilities such as in the instant case that has invoked the opposition of non-Protestant religious groups.
The defendants filed a motion to dismiss on the grounds that the complaint failed to state a cause of action; that plaintiffs had no standing to bring this suit; that plaintiffs had failed to allege sufficient facts entitling them to declaratory or injunctive relief; and that plaintiffs had not alleged any facts tending to show a violation by defendants of any rights guaranteed to plaintiffs by the Constitutions of the United States and the State of Florida.
The lower court granted defendants' motion to dismiss but did not specify any particular ground for dismissal. After plaintiffs elected not to amend, a final judgment was entered on the dismissal of the complaint and plaintiffs appealed to the Supreme Court. That court, after noting that its jurisdiction had been improvidently invoked, transferred the cause to this court.
The plaintiffs contend that, as taxpayers and residents of Orange County, Florida, they have the right to see that public funds and other public property in Orange County are not used in aid of churches or sectarian purposes and cite in support of this contention Southside Estates Baptist Church v. Board of Trustees, Fla. 1959, 115 So.2d 697. The defendants answer that Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475, disposes of a similar "standing as a taxpayer" contention and that the plaintiffs have thus failed to support their status to bring this suit.
Aside from the "taxpayer" contention, the plaintiffs contend that, as parents of children attending the public schools in which the alleged unconstitutional acts are committed, there can be no question of their standing to bring this action. With this we agree on the basis that these parents, having an immediate and direct interest in their natural children's spiritual and religious development, are possessed of the requisite standing in that this interest is alleged to be encroached upon. See State of Illinois ex rel. McCollum v. Board of Education, 1948, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649; Zorach v. Clauson, 1952, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954.
The complaint alleges that the defendants had permitted and authorized annual distributions of the Gideon Bibles in the Junior High Schools of Orange County during the 1956-57, 1957-58, 1958-59, and 1959-60 school years. No allegation is made that the distribution of Bibles has been completed for the current year, nor is there an allegation that the defendants have positively manifested that such distribution will occur in the future. The complaint does aver that plaintiffs have requested the defendants discontinue this practice of compelling plaintiffs' children to attend assembly on school property to receive these *183 Bibles; that the defendants have refused to grant this request; and that defendants will continue to authorize and permit this distribution of Gideon Bibles unless enjoined by the court.
The complaint points out that the Gideon Bible consists of the New Testament, Psalms and Proverbs from the Old Testament, and is the King James version of translation; that this version of the Bible is primarily Protestant and violates the teachings and tenets of the religious faith of plaintiffs; and that distribution of this Bible by the defendants aids certain religious groups and therefore violates plaintiffs' rights under the First Amendment to the United States Constitution and Section 6, Declaration of Rights of the Florida Constitution, F.S.A. There are other allegations of the lengthy but skilfully drafted complaint which make similar averments but we have summarized a sufficient portion to illustrate the issues with which we are here confronted.
The question of separation of church and state, aside from its recent widespread publicity, has been judicially discussed and delineated in light of numerous factual situations. Under even the most strict interpretation, the First Amendment of the United States Constitution forbids preferential treatment by government, Federal or State, of one sect or religion over others. Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711; Fowler v. State of Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828; Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954.
The doctrine of separation of church and state can be best understood in light of its history of the struggles and conflicts through the centuries which precipitated its inclusion in the First Amendment. No attempt to narrate this history will be made in this opinion but for a thorough account of this subject see Tudor v. Board of Education, 14 N.J. 31, 100 A.2d 857, 45 A.L.R. 2d 729, and Justice Rutledge's dissent in Everson v. Board of Education, supra.
Section 6, Declaration of Rights of the Florida Constitution provides:
"Religious preferences; public aid, etc.  No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution."
The prohibition against preference which is implicit in the First Amendment is explicitly provided for in the above quoted portion of the Declaration of Rights. It is clear that state power is no more to be used so as to handicap religions than it is to be used to favor them. Koerner v. Borck, Fla. 1958, 100 So.2d 398. More expressly, neither a public school system nor its property can be employed in permanent promotion of any particular religious sect or denomination. See Southside Estates Baptist Church v. Board of Trustees, Fla. 1959, 115 So.2d 697, 699, wherein Mr. Justice Thornal emphasized this proposition but differentiated the issue involved in that case from the issue presented in the instant case by stating:
"We are not here involved in any problem dealing with the compulsory teaching of the bible or of some religious faith through the medium of the public school system. People [of] State of Ill. ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 648 [649], 2 A.L.R.2d 1338. Neither are we confronted with a situation such as that presented in Tudor v. Board of Education, 14 N.J. 31, 100 A.2d 857, 45 A.L.R.2d 729, where the Supreme Court of New Jersey held that the distribution of Gideon Bibles in the public schools constituted a showing of a preference for Protestantism over Judaism and Catholicism and was, therefore, prohibited by the State and Federal Constitutions."
During the development of constitutional law in this century certain substantive personal rights gained protection from state *184 interference on the basis that these rights are encompassed within the "liberty" which states cannot take away without due process of law. Gitlow v. People of State of New York, 1925, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138. Although the Gitlow case only casually established this protection, two years later the U.S. Supreme Court invalidated a state law on the ground that it abridged freedom of speech contrary to the due process clause of Amendment XIV. Fiske v. State of Kansas, 1927, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108. Subsequent decisions have brought the other rights safeguarded by the First Amendment, i.e. freedom of religion, Cantwell v. State of Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, freedom of the press, Near v. State of Minnesota, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, and the right of peaceable assembly, DeJonge v. State of Oregon, 1937, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278, within the protection of the Fourteenth Amendment. In consequence of these decisions, the subsequent cases dealing with the safeguarding of freedom of religion against infringement by the states are applicable to the instant discussion even though the cases are primarily discussing the First Amendment.
The Court, in Everson v. Board of Education, 1947, supra, outlined and gave emphasis to the protection of religious freedom by stating [330 U.S. 1, 67 S.Ct. 512]:
"In the words of Jefferson, the clause against establishment of religion by law was intended to erect `a wall of separation between Church and State'."
This interpretation of the First Amendment was reaffirmed in People of State of Illinois ex rel. McCollum v. Board of Education, 1948, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, wherein the Court held that an Illinois board of education could not provide for religious instruction to students during school hours in cooperation with a local association of churches. In Zorarch v. Clauson, 1952, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954, the Court held that the released time program of New York City school board did not violate the First Amendment as interpreted in the Everson and McCollum cases on the ground that the program in no way involved the public school authorities promoting or carrying out the religious instruction since the instruction was held outside of the school buildings. The Court noted that the school authorities merely closed the school to permit the students to seek religious instruction of their own choosing.
The only case which we have found involving the validity of distribution of Bibles in the public schools is Tudor v. Board of Education, 1953, 14 N.J. 31, 100 A.2d 857, 45 A.L.R.2d 729, certiorari denied Gideons International v. Tudor, 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 644, wherein a Jewish and a Catholic parent, both taxpayers, sought to enjoin the carrying out of a resolution of a municipal board of education permitting the free distribution, offered by the local branch of Gideons International, of Gideon Bibles, a compilation of the New Testament and the Books of Proverbs and Psalms of the Old Testament, all in the King James version. The distribution was to be given only to those pupils whose parents signed requests therefor on a form prepared by the board and passed out by the pupils, and distribution was to be made after school hours without publicity. Pending the action, the Catholic parent transferred his child to a Catholic parochial school and his case became moot, obviating a determination of whether a distribution of the King James version of portions of both the Old and New Testament represented an unconstitutional preference of Protestantism over Catholicism. The Court adhered to its decision in Doremus v. Board of Education, 1950, 5 N.J. 435, 75 A.2d 880, appeal dismissed 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475, but based its decision upon the finding that the New Testament, as testified by Jewish scholars, conflicts with the doctrines of Judaism and is unacceptable to persons of that faith. The Court *185 held that the Gideon Bible is a sectarian book and that the school board's resolution permitting its distribution in the public schools violated both the religion clause of the First Amendment to the U.S. Constitution, made applicable to the states by the Fourteenth Amendment, and that clause of the New Jersey constitution prohibiting "establishment of one religious sect, in preference to another." Art. I, § IV.
The Court also noted, after review of the testimony of psychologists, that pressures would be exerted upon nonconforming pupils, thus creating an unconstitutional preference, and that the reasonable interpretation of the use of the school system as a means of distribution would be to place a stamp of approval upon the Gideon version of the Bible in the eyes of the pupils and parents. Chief Justice Vanderbilt, speaking for the Court, concluded by stating [14 N.J. 31, 100 A.2d 868]:
"We are here concerned with a vital question involving the very foundation of our civilization. Centuries ago our forefathers fought and died for the principles now contained in the Bill of Rights of the Federal and New Jersey Constitutions. It is our solemn duty to preserve these rights and to prohibit any encroachment upon them. To permit the distribution of the King James version of the Bible in the public schools of this State would be to cast aside all the progress made in the United States and throughout New Jersey in the field of religious toleration and freedom. We would be renewing the ancient struggles among the various religious faiths to the detriment of all. This we must decline to do."
We have carefully considered this most difficult question in light of the authorities cited and many others which have not been discussed herein and conclude that the instant complaint states a cause of action against the defendants. The distribution of Gideon Bibles through the school system each year certainly approximates an annual promotion and endorsement of the religious sects or groups which follow its teachings and precepts. This distribution likewise would tend to impair the rights of plaintiffs and their children to be free from governmental action which discriminates in the free exercise of religious belief. Justice Biggs, in Schempp v. School District of Abington Township, D.C.Pa. 1959, 177 F. Supp. 398, 407, stated in regard to a compulsory Bible reading statute:
"Even more clearly are the rights of the parents interfered with. Parents may well wish that their children develop a religious sensibility. If the faith of a child is developed inconsistently with the faith of the parent and contrary to the wishes of the parent, interference with the familial right of the parent to inculcate in the child the religion the parent desires, is clear beyond doubt. The right of the parent to teach his own faith to his child, or to teach him no religion at all is one of the foundations of our way of life and enjoys full constitutional protection."
If the Gideons, instead of distributing the King James Bible had distributed the Douay version exclusively, or the Koran, the Moslem Bible, or the Talmud, the body of Jewish civil and canonical law, through the school system of an area whose inhabitants were strongly Protestant, we surmise that the Protestant groups would feel a sectarian resentment against the actions of the school authorities.
This question could be narrowed by suggesting that if the doctrinaire books of either the Methodist, Baptist, Presbyterian, or other of the numerous divisions of the Protestant world, were distributed through the school system to the exclusion of the other groups, considerable legal action would justifiably ensue.
Thomas Jefferson, an architect of religious freedom in this nation, foresaw the *186 friction that would develop were not State and Church separated. He wrote:
"Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of Government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should `make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State." 8 The Writings of Thomas Jefferson (Washington ed., 1861) 113.
The judgment of the lower court must be reversed and the complaint reinstated for such proceeding as the parties deem expedient not inconsistent herewith.
Reversed.
KANNER and SHANNON, JJ., concur.