Edward Lewis SCHEMPP, Sidney Gerber Schempp, Individually and as Parents and Natural Guardians of Ellory Frank Schempp, Roger Wade Schempp and Donna Kay Schempp

v.

SCHOOL DISTRICT OF ABINGTON TOWNSHIP, PENNSYLVANIA, James F. Koehler, O. H. English, Eugene Stull, M. Edward Northam.

Civ. A. No. 24119.

United States District Court
E. D. Pennsylvania.

Sept. 16, 1959.

As Amended Sept. 22, 1959.

Henry W. Sawyer, III, Wayland H. Elsbree, Philadelphia, Pa., for plaintiffs.

C. Brewster Rhoads, Philip H. Ward, Sidney L. Wickenhaver, Philadelphia, Pa., Percival R. Rieder, Abington, Pa., for defendants.

Lois G. Forer, Philadelphia, Pa., amicus curiae.

Leo Pfeffer, New York City, Maximillian J. Klinger, Theodore R. Mann, Philadelphia, Pa., for American Jewish Congress, amicus curiae.

Lewis F. Adler, Harrisburg, Pa., for Pennsylvania State Education Ass'n., amicus curiae.

Before BIGGS, Circuit Judge, and KIRKPATRICK and KRAFT, District Judges.

BIGGS, Circuit Judge.

The suit at bar is brought by Edward Lewis Schempp and Sidney Gerber Schempp, individually and as parents and natural guardians of Ellory Frank Schempp, Roger Wade Schempp and Donna Kay Schempp, against School District of Abington Township, Montgomery County, Pennsylvania, O. H. English, Superintendent of Abington Township Schools, Eugene Stull, Principal of the Abington Senior High School, and M. Edward Northam, Principal of the Huntingdon Junior High School, located in Abington Township. The suit is brought under 28 U.S.C. §§ 1343 and 2281, and was heard by a three-judge court pursuant to 28 U.S.C. § 2284. The parent plaintiffs complain on behalf of themselves as parents and as the natural guardians of Ellory, Roger and Donna, their minor children. At the time of the filing of the action, the older son, Ellory, was a student at the Abington Senior High School but graduated from that school prior to the trial, which was held during the summer recess. All the parties are in accord that the application for an injunction is moot as to him.[1]

The complaint alleges that the Pennsylvania statute which provides for the reading of ten verses of the "Holy Bible"[2] by teachers or students[3] is unconstitutional as an establishment of religion and a prohibiting of the free exercise thereof. The complaint makes a similar assertion in respect to the reading of the ten verses in conjunction with the practice of recitation[4] in unison by students and teachers of the Lord's Prayer.[5] The plaintiffs also assert, though not in the complaint, that the recitation of the Lord's Prayer in and of itself in the public schools of Abington Township is unconstitutional for similar reasons.[6] The prayers at the end of each count of the complaint are substantially the same and seek declarations of unconstitutionality and the permanent enjoining of the practices complained of.[7]

## I.

The parent plaintiffs are of the Unitarian faith and are members of a

---

[1]. We are not barred, however, from considering the evidence given by him, relevant to the practices in the schools of Abington Township.

[2]. It will be observed that the Legislature of Pennsylvania did not define the term "Holy Bible". It did not, for example, make any differentiation between the King James Version of the Bible, frequently employed in the religious exercises of Protestant Churches and the Douay Version, the authorized Bible of the Roman Catholic Church.

[3]. Section 1516 of the Public School Act of March 10, 1949, as amended, 24 P.S.Pa. § 15–1516, provides as follows: "At least ten verses from the Holy Bible shall be read, or caused to be read, without comment, at the opening of each public school on each school day, by the teacher in charge: Provided, That where any teacher has other teachers under and subject to direction, then the teacher exercising such authority shall read the Holy Bible, or cause it to be read, as herein directed.

"If any school teacher, whose duty it shall be to read the Holy Bible, or cause it to be read, shall fail or omit so to do, said school teacher shall, upon charges preferred for such failure or omission, and proof of the same, before the board of school directors of the school district, be discharged."

[4]. A recitation of the Lord's Prayer is, of course, not covered by the statute.

[5]. The prayer of the fourth count of the complaint is as follows: "WHEREFORE, plaintiffs [the parents] pray this court preliminarily, and after trial of this suit permanently, to enjoin the enforcement, operation, and execution of Section 1516 of the Act of March 10, 1949; P.L. 30, as amended, to declare said act unconstitutional; to declare as unconstitutional the practice of causing the Holy Bible to be read and of directing the saying of the Lord's Prayer at the Abington Township Senior High School and Huntingdon Junior High School, and to enjoin and declare unconstitutional the expenditure of funds for the purchase of Holy Bibles."

See the plaintiffs' brief, Requests for Findings of Fact and Conclusions of Law, and the transcript of the oral arguments.

[7]. An injunction against the expenditure of public funds for the purchase of "Holy Bibles" was not pressed by the plaintiffs and is treated as abandoned.

Unitarian Church in Germantown, Pennsylvania, which they attend regularly together with their three children, Ellory, Roger and Donna. The children also attend Sunday School regularly. Ellory was eighteen years of age at the time of the trial and had attended the Abington Senior High School from which he graduated in June of 1958. Roger was fifteen at the time of the trial and was an eighth grade student in the Huntingdon Junior High School in Abington Township during the academic year previous to the trial. Donna was twelve years old at the time of the trial and was also a student at the Huntingdon Junior High School and in the academic year preceding the trial had been in the seventh grade. All three children testified at the trial and their evidence proves that it was the practice of the various schools of the Township which they attended to observe the opening period of each day with a brief ceremony consisting of the reading of ten verses of the "Holy Bible", followed by a standing recitation in unison of that portion of the New Testament known as the "Lord's Prayer",[8] and that generally the ceremony was followed by the familiar Pledge of Allegiance to the Flag.

The testimony of the three children described a number of variations in the manner employed in the execution of this ceremony from school to school. The required ten verses were read either by the "home room" teacher or by students in the "home room", who either volunteered or were selected by rotation. An exception to these practices was recounted by Ellory Schempp who said that after the Senior High School had moved to a new building equipped with a public address system, the Bible was read over the loud speaker in each classroom following which a voice on the loud speaker directed the children to rise and repeat the Lord's Prayer.[9] Donna Schempp testified that during the reading of the Bible a standard of physical deportment and attention of higher caliber than usual was required of the students. Edward L. Schempp, father of the minor plaintiffs, stated that the Bible reading, in the manner in which it was conducted, was "given a degree of authority * * * beyond normal school authority."

The three Schempp children and their father testified also as to items of religious doctrine purveyed by a literal reading of the Bible, particularly the King James Version,[10] which were contrary to the religious beliefs which they held and to their familial teaching.[11]

Roger and Donna testified that they had never protested to their teachers or other persons of authority in the school system concerning the practices of which they now complain. In fact, on occasion, Donna herself had volunteered to read the Bible. The father, Edward Schempp, testified also that no complaint was lodg-

---

**8.** Matthew 6:9. A directive for the recitation of the Lord's Prayer is included in the "Employees' Handbook and Administrative Guide," issued from the office of O. H. English, Superintendent of Abington Township Schools. The origin of the practice of reciting the Lord's Prayer coupled with Bible reading is obscure, although the practice has endured for over thirty years.

**9.** The Bible was read by one of the students enrolled in an elective course, described as the Radio and Television Workshop. W. W. Young, teacher of the course, testified that the students assigned to read the Bible on any particular day could employ the text of his own choosing, and also could select the particular ten verses to be read. In addition to the King James Version, the Douay Version and the Jewish Holy Scriptures were used.

**10.** Superintendent English testified that the King James Version of the Bible was purchased by the School, that one copy was issued to every school teacher in the District, and that no other versions of the Bible were ever purchased.

**11.** Ellory Schempp testified that he did not believe in the divinity of Christ, the Immaculate Conception, or the concepts of an anthropomorphic God or the Trinity. All of these doctrines were read to him at one time or another during the course of his instruction at the Abington High School. The other two children and Edward L. Schempp, their father, testified similarly.

ed by him with the school authorities. Ellory Schempp, however, did complain of the practices, and demonstrated his objection first in November of 1956 by reading to himself a copy of the Koran while the Bible was being read, and refusing to stand during the recitation of the Lord's Prayer. He testified that his home room teacher stated to him that he should stand during the recitation of the Lord's Prayer, and that he then asked to·be excused from "morning devotions". Afterwards he was sent to discuss the matter with the Vice-Principal and the School Guidance Counsellor. As a result, for the remainder of the year, Ellory spent the period given over for "morning devotions" each day in the Guidance Counsellor's office. At the beginning of the next academic year, which was Ellory's last in the Abington Township school system, he asked his then home room teacher to be excused from attendance at the ceremony. After discussing the matter with the Assistant Principal, that official told Ellory that he should remain in the home room and attend the morning Bible reading and prayer recitation period as did the other students.[12] This he did for the remainder of the year. The defendant Superintendent and the School Principals testified that no complaint, other than that of Ellory Schempp, had ever been received from any source. This evidence was uncontradicted.

We have the testimony of expert witnesses. Dr. Solomon Grayzel[13] testified that there were marked differences between the Jewish Holy Scriptures and the Christian Holy Bible, the most obvious of which was the absence of the New Testament in the Jewish Holy Scriptures. Dr. Grayzel testified that portions of the New Testament were offensive to Jewish tradition and that, from the standpoint of Jewish faith, the concept of Jesus Christ as the Son of God was "practically blasphemous". He cited instances in the New Testament which, assertedly, were not only sectarian in nature but tended to bring the Jews into ridicule or scorn.[14] Dr. Grayzel gave as his expert opinion that such material from the New Testament could be explained to Jewish children in such a way as to do no harm to them. But if portions of the New Testament were read without explanation, they could be, and in his specific experience with children Dr. Grayzel observed, had been, psychologically harmful to the child and had caused a divisive force within the social media of the school.

Dr. Grayzel also testified that there was significant difference in attitude with

12. The reason given by the Assistant Principal, according to Ellory's testimony, was "to show respect and * * * simply to obey a school rule; that matters of conscience and religion were not as important here as merely conforming to the school rule." Record of testimony, p. 28.

13. Dr. Grayzel graduated from the City College of New York City and Columbia University. He attended the Jewish Theological Seminary, was ordained a Rabbi and received a Doctorate of Philosophy from Dropsie College of Philadelphia, an institution of rabbinical, Semitic and Hebrew studies. The Jewish Publication Society of which Dr. Grayzel is the editor, is the publisher of an English translation of the Jewish Bible, *viz.*, the Holy Scriptures according to the Masoretic Text, and is presently engaged in a retranslation from the Hebrew into English. As a member of the translation committee, Dr. Grayzel stated that he was familiar with the King James Version, the Revised Standard Version and both the Douay and the Knox Catholic Versions. Dr. Grayzel was undoubtedly qualified as an expert witness.

14. In particular, Dr. Grayzel cited the famous scene portrayed in Matthew 27, the trial of Jesus Christ before Pilate. He pointed out that as related in the Christian New Testament the Jews are portrayed as refusing to exchange Barabbas for Jesus but insisted upon crucifixion in spite of the attempts of Pilate to placate the mob. He cited the washing of hands by Pilate and then the verse 25: "Then answered all the people, and said, 'His blood be on us, and our children'." Concerning this verse Dr. Grayzel stated that it had been the cause of more anti-Jewish riots throughout the ages then anything else in history.

regard to the respective Books of the Jewish and Christian Religions in that Judaism attaches no special significance to the reading of the Bible *per se* and that the Jewish Holy Scriptures are source materials to be studied. But Dr. Grayzel did state that many portions of the New, as well as of the Old, Testament contained passages of great literary and moral value.

Dr. Luther A. Weigle, an expert witness for the defense,[15] testified in some detail as to the reasons for and the methods employed in developing the King James and the Revised Standard Versions of the Bible. On direct examination, Dr. Weigle stated that the Bible was non-sectarian.[16] He later stated that the phrase "non-sectarian" meant to him non-sectarian within the Christian faiths. Dr. Weigle stated that his definition of the Holy Bible would include the Jewish Holy Scriptures, but also stated that the "Holy Bible" would not be complete without the New Testament. He stated that the New Testament "conveyed the message of Christians." In his opinion, reading of the Holy Scriptures to the exclusion of the New Testament would be a sectarian practice. Dr. Weigle stated that the Bible was of great moral, historical and literary value. This is conceded by all the parties and is also the view of the court.

We can perceive no substantial contradictions in the testimony of any of the witnesses and we find the operative facts in the instant case to be as stated by them.

## II.

The plaintiffs contend that the practices, as described, of the Abington Township schools constituted an establishment of religion and a prohibiting of the free exercise thereof and are therefore a violation of rights guaranteed by the First Amendment to the Constitution of the United States, made applicable to the States by the Fourteenth Amendment. Murdock v. Commonwealth of Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292.

The defendants assert a position which is diametrically opposite to that of the plaintiffs. They contend in substance that a reading without comment of ten verses of the "Holy Bible" at the opening of each school day does not effect, favor or establish a religion or prohibit the free exercise thereof, that freedom of religion or of conscience does not include a right to practice one's beliefs or disbeliefs concerning the Bible by preventing others from hearing it read in the public schools. They contend also that reading without comment of ten verses of the "Holy Bible", of whatever version, is a substantial aid in developing the minds and morals of school children and that the State has a constitutional right to employ such practices in its educational program. They assert as well that the custom of saying the Lord's Prayer does not concern an establishment of religion nor violate the religious conscience of pupil or parent. Finally they contend that there is no compulsion upon the plaintiffs in respect to religious observances and that they have not shown that they have been deprived of any constitutional right.

## III.

Certain preliminary questions of law must be disposed of before we can come to the basic issues. These are: (1) Is there a substantial federal question presented for the consideration of this court? While it is obvious from our

15. Dr. Weigle testified at length as to his experience and background in matters concerning theology. He is an ordained Lutheran Minister and is Dean Emeritus of the Yale Divinity School. He was and is Chairman of the Committee for the preparation of the Revised Standard Version of the Bible. He was Sterling Professor of Religious Education at Yale until he was made Dean Emeritus. There can be no doubt as to Dr. Weigle's qualifications as an expert.

16. Dr. Weigle, in defining "sectarian", stated: "A movement is sectarian when it is meant to establish the distinctive doctrine of some particular sect as opposed to the doctrine of other sects." Record at p. 252.

discussion of the merits that this court considers the federal questions presented to be substantial, a few words at this point to further demonstrate substantiality are proper. Insofar as we can ascertain neither the dimensions of the rights asserted here by the plaintiffs nor their claimed infringement have been presented for adjudication by the federal courts, and it follows that the federal question involved here is not foreclosed from our determination by prior decisions. See Louisville & Nash. R. Co. v. Melton, 1910, 218 U.S. 36, 49, 30 S.Ct. 676, 54 L.Ed. 921. In the light of issues involving First Amendment liberties which the Supreme Court has considered in previous cases, some of which we shall refer to, we cannot say that these plaintiffs have not the right to demonstrate that their religious liberties have been violated.

■ (2) Is the doctrine of abstention applicable here, particularly in view of recent decisions of the Supreme Court? See County of Allegheny v. Frank Mashuda Co., 1959, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (diversity jurisdiction); Harrison v. NAACP, 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L. Ed.2d 1152 (jurisdiction under 28 U.S.C. § 2281); Louisiana Power & Light Co. v. City of Thibodaux, 1959, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (diversity jurisdiction). We conclude that the doctrine of abstention does not prohibit this court from proceeding to a determination of the issues involved. We begin with the proposition that a United States district court has the duty to adjudicate a controversy properly before it. County of Allegheny v. Mashuda Co., supra. We believe that the limitations upon the discharge of this duty, essential elements of the abstention doctrine, are not applicable here. The Pennsylvania statute is brief and its mandate is clear. No issue of statutory construction is presented by the parties, and we cannot see that the statute lends itself to varying interpretations so that this court should withhold adjudication of the issues until the Courts of Pennsylvania have had the opportunity to construe the Act of March 10, 1949, in the light of state and federal constitutions. No interference with the administrative processes of the Commonwealth of Pennsylvania is involved here, nor by adjudicating the merits of the controversy do we create "needless friction by unnecessarily enjoining state officials from executing domestic policies." See County of Allegheny v. Mashuda Co., supra. If, as we believe, there are substantial rights involved, and if the merits compel a decision in favor of the plaintiffs, the resulting restraint on the School District cannot issue "unnecessarily". See Doud v. Hodge, 1956, 350 U.S. 485, 487, 75 S.Ct. 491, 100 L.Ed. 577.

■ (3) Do the children and the parents possess the standing to maintain the suit at bar? This is not a case where the jurisdictional issue of standing to sue is easily separated from consideration of the merits. Nonetheless, we can say that the alleged injury is one which, if proven, is direct as to them and not merely derivative from some injury to school children and their parents generally. The standing of the children is similar to that of the minor plaintiffs in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, Ellory excepted, his case having become moot. As to the parents' standing to bring suit in their own right, we believe that they, as the natural guardians of their children, having an immediate and direct interest in their spiritual and religious development, are possessed of the requisite standing in that this interest is alleged to be encroached upon. Note the standing accorded to the parent plaintiffs in Illinois ex rel. McCollum v. Board of Education, 1948, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 648, and particularly in Zorach v. Clauson, 1952, 343 U. S. 306 n. 4, 72 S.Ct. 679, 96 L.Ed. 954.

## IV.

We come now to the basic issues. It is clear that the plaintiffs allege in their complaint that the practice of reading the "Holy Bible" with or without

the addition of the recitation of the Lord's Prayer violates their constitutional rights. They argue also that the compulsory recital of the Lord's Prayer, solely, standing alone, i. e., not in conjunction with Bible reading, is "sectarian".[17] It might also be argued with equal force that the compulsory recital of the Lord's Prayer, solely, standing alone, constitutes an establishment of religion and a prohibiting of the free exercise thereof. But we do not and cannot reach issues relating to a ceremony which consists of the recital of the Lord's Prayer, Bible reading being omitted therefrom. Such a case is not before us. It could be argued, of course, that because the Bible verses were never read without being followed by the recital of the Lord's Prayer, the reading and the recital constitute a unitary whole which cannot be separated effectively for purposes of adjudication and only that unit, reading and recital together, is before us. The parties have not made such a contention and we do not think that it would be a valid one. The reading of the ten verses preceded the recital of the Lord's Prayer and was separated from it on every occasion by an interval of time, however slight. We conclude that we are entitled to pass on and do pass on (1) the constitutional issues presented by the reading of ten verses of the Bible, and (2) the constitutional issues raised by the reading of the Bible verses followed by the recital of the Lord's Prayer.

The Legislature prescribed the reading of the "Holy Bible". While many versions of the Bible exist, all are known primarily as books of worship. Their use in this connection comes first to mind. Inasmuch as the verses of the Bible address themselves to, or are premised upon a recognition of God, the Bible is essentially a religious work. To characterize the Bible as a work of art, of literary or historical significance, and to refuse to admit its essential character as a religious document would seem to us to be unrealistic.[18] The question is, accepting the "Holy Bible" as a religious document, regardless of the version involved, is its use in the manner prescribed by the statute violative of the terms of the First Amendment?

The verses of the Bible, though they are of great literary merit, are embodied in books of worship, regardless of the version, devoted primarily to bringing man in touch with God.[19] If study of the Bible as an artistic work, a treasury of moral truths, or historical text can be separated from the espousal of doctrinal matters and religiousness, we should find no objection. But the manner in which the Bible is employed as required by the legislative fiat does not effect this division. The daily reading of the Bible buttressed with the authority of the State and, more importantly to children, backed with the authority of their teachers, can hardly do less than inculcate or promote the inculcation of various religious doctrines in childish minds. Thus, the practice required by the statute amounts to religious instruction, or a promotion of religious education. It makes no difference that the religious "truths" inculcated may vary from one child to another. It also makes no difference that a sense of religion

17. The plaintiffs' brief states: "A practice of having a religious ceremony which consists of solely of the reading of a Bible and/or the mere recitation of the Lord's Prayer is sectarian * * *."

If this issue were presented on the facts, this court, as constituted, would be entitled to adjudicate it. See note 8, supra, and Two Guys from Harrison-Allentown, Inc. v. McGinley, 3 Cir., 1959, 266 F.2d 427.

18. During the course of cross-examination of Dr. Weigle, the following passage from his book, "The English New Testament," was quoted: "The message of the Bible is the central thing, its style is but an instrument for conveying the message. The Bible is not a mere historical document to be preserved. And it is more than a classic of English literature to be cherished and admired. The Bible contains the Word of God to man * * *." Record at p. 270.

19. See Note 18, supra.

may not be instilled. In Everson v. Board of Education, 1947, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711, the Supreme Court stated, 'The establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." In our view, inasmuch as the Bible deals with man's relationship to God and the Pennsylvania statute may [20] require a daily reminder of that relationship, that statute aids all religions. Inasmuch as the "Holy Bible" is a Christian document, the practice aids and prefers the Christian religion.[21]

In Illinois ex rel. McCollum v. Board of Education, supra, where children were released from classes for a thirty to forty-five minute period of religious instruction each week by the minister, rabbi, or priest of their choice in school classrooms, and where children not choosing to do this were required to go to some other place in the building in pursuit of their secular studies, the Supreme Court declared the practice violative of the First Amendment. In the case at bar the religious instruction is conducted, not by persons who visit the school building by invitation but by the teachers themselves, by mandates of the Legislature of Pennsylvania and of the Superintendent of Schools. See notes 3 and 8 supra. Thus, strikingly, has the Commonwealth of Pennsylvania supported the establishment of religion.

The reading of the Bible without comment, the defendants assert, permits each listener to interpret what he hears in the fashion he desires, and that therefore there is no inculcation of religion. This argument falls for two reasons. First, it either ignores the essentially religious nature of the Bible, or assumes that its religious quality can be disregarded by the listener. This is too much to ignore and too much to assume. The religiousness of the Bible, we believe, needs no demonstration. Children cannot be expected to sift out the religious from the moral, historical or literary content. Second, the testimony of the Schempps and Dr. Grayzel [22] proves that interpretations of the Bible, dependent upon the inclinations of scholars and students, can result in a spectrum of meanings, beginning at one end of the spectroscopic field with literal acceptance of the words of the Bible, objectionable to Unitarians such as the Schempps, and ending in the vague philosophical generalities condemned by fundamentalists.[23] Of course children will interpret the Bible and will do so in terms of their religious instruction and in such a way as to make what they hear conform to their own religious commitments, generally those instilled by their parents. A contrary view seems to us to be untenable.

It is clear from the evidence that the school children had to maintain, during the course of the morning exercises, a respectful mien more in keeping with a devotional or religious rite than with ordinary classroom instruction. The reading of the ten verses without comment was followed by a recital of the Lord's Prayer. The combination of the reading of the ten verses of the Holy Bible, followed immediately by the recitation of the Lord's Prayer, in our opinion gives to the morning exercises a devotional and religious aspect. Indeed, the

20. We use "may" since there are verses in the Bible which read alone, teach moral truths independent of a God to man relationship.

21. Dr. Weigle said, as we have stated at an earlier point in this opinion, that the "Holy Bible" would be incomplete without the New Testament, and that the New Testament conveyed the message of Christians.

22. See especially note 14, supra.

23. We note parenthetically the statement of the Court in West Virginia State Bd. of Education v. Barnette, 1943, 319 U.S. 624, at pages 632–633, 63 S.Ct. 1178, at page 1182, 87 L.Ed. 1628, speaking of the flag and the flag salute: "A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn."

morning exercises were referred to on frequent occasions by the students as "morning devotions". Counsel for the School Board referred to the ceremony as "devotional services". The addition of the Flag Salute to the ceremony cannot be deemed to detract from the devotional quality of the morning exercises. Our backgrounds are colored by our own experiences and many of us have participated in such exercises as those required in the Abington Township schools in our childhood. We deemed them then and we deem them now to be devotional in nature, intended to inculcate religious principles and religious beliefs.

The evidence adduced by Abington Township that several versions of the Bible and also the Jewish Holy Scriptures have been used proves only that the religion which is established is either sectless or is all-embracing, or that different religions are established equally. But none of these conditions, assuming them to exist, purges the use of the Bible as prescribed by the statute of its constitutional infirmities.[24]

Whether or not mere reading of the Bible, without comment, is a religious ceremony, a state supported practice of daily reading from that essentially religious text in the public schools is, we believe, within the proscription of the First Amendment. "[T]he First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." Illinois ex rel. McCollum v. Board of Education, supra, 333 U.S. at page 212, 68 S.Ct. at page 465.

We conclude also, that the reading of the Bible as required by the Pennsylvania statute prohibits the free exercise of religion. The sanction imposed upon the school teachers is discharge from their offices if they fail to observe the requirements of the statute.[25] It is true that no sanction is directly imposed upon the school children who fail to observe the provisions of the statute but it cannot be contended successfully that where a course of conduct is compelled for school teachers and school superintendents, that they will not use every effort to cause the children committed to their guidance and care to form an audience for the reading of the Bible according to the terms of the statute. Such compulsion may be disguised but would be effective nonetheless. Ellory Schempp, in his last year at the Abington Senior High School was directed to attend the exercises by the Assistant Principal of his school, acting under the authority of his office. See note 12, supra. At one time he was directed by his home room teacher to stand during the recitation of the Lord's Prayer. The compulsion, on the other hand, may be subtle and thus particularly effective in respect to children of tender years, such as Roger and Donna. "The law of imitation operates, and non-conformity is not an outstanding characteristic of children." Illinois ex rel. McCollum v. Board of Education, supra, 333 U.S. at page 227, 68 S.Ct. at page 473 (concurring opinion). The argument made by the defendants that there was no compulsion ignores reality and the forces of social suasion. Tudor v. Board of Education, 1953, 14 N.J. 31, 100 A.2d 857, at pages 866–868, 45 A.L. R.2d 729. Moreover, attendance at school is required by the law of Pennsylvania of every child of school age under criminal penalties imposed on parents or other persons in *loco parentis*. 24 P.S. Pa. § 13–1327 (Supp.1959), § 13–1333 (1949). This mandatory requirement of school attendance puts the children in the path of the compulsion.

The pressures of the statute and the attitudes of both school officials and the teaching staff were directed to all of the children in the Abington Township schools referred to and not to the Schempps alone, but only the latter have

---

24. Cf. the facts of Illinois ex rel. McCollum v. Board of Education, 1948, 333 U.S. 203, 68 S.Ct. 461.

25. See note 3, supra.

rebelled. We think it is misleading to suggest that because only the Schempps have objected that the statute prescribes conduct which is not compulsory both as to teachers and pupils. Indeed the lack of protest may itself attest to the success and the subtlety of the compulsion. One can say with verity that in schools conducted in accordance with the legislative fiat, the reading of the "Holy Bible" is compulsory as to teachers and pupils.

In West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, school children were ordered by resolution of the Board of Education to salute the flag, and refusal to do so was regarded as an act of insubordination. The resolution was objected to by members of the sect of Jehovah's Witnesses, who refused to salute the flag considering it to be a "graven image". The resolution was struck down as unconstitutional. Such a compromising of religious conscience could not be countenanced. The daily reading of the Bible, operating upon the receptive minds of children compels them to listen with attention. This indoctrinates them with a religious sense. This under the circumstances at bar constitutes an interference with the free exercise of religion.

Even more clearly are the rights of the parents interfered with. Parents may well wish that their children develop a religious sensibility. If the faith of a child is developed inconsistently with the faith of the parent and contrary to the wishes of the parent, interference with the familial right of the parent to inculcate in the child the religion the parent desires, is clear beyond doubt. The right of the parent to teach his own faith to his child, or to teach him no religion at all is one of the foundations of our way of life and enjoys full constitutional protection.

The statement of the Supreme Court in West Virginia State Board of Education v. Barnette, supra, 319 U.S. at page 630, 63 S.Ct. at page 1181 that "[T]he refusal of these persons [the plaintiffs] to participate in the [flag salute] ceremony does not interfere with or deny rights of others to do so" does not compel a contrary result, as the defendants here urge. While others may have a right to salute the flag in public schools, we think, as our previous discussion demonstrates, that there is no corresponding right to have the Bible read in public schools in the manner required.

Having characterized the morning exercises in the Abington Township schools as a religious ceremony, it requires but little citation of authority to demonstrate that these exercises, conducted under the aegis of the Commonwealth of Pennsylvania, are violative of the terms of the First Amendment. What we have said in respect to Illinois ex rel. McCollum v. Board of Education, supra, and its application to religious instruction, applies with at least equal force to the conducting of the exercises as religious ceremonies.

We hold the statute in issue to be unconstitutional.

### V.

In addition to those set out in the foregoing opinion we make the following additional findings of fact and conclusions of law. Rule 52, Fed.R.Civ.Proc., 28 U.S.C.

### Findings of Fact.

(1) Plaintiffs Edward Louis Schempp and Sidney Gerber Schempp are the parents and natural guardians of minor plaintiffs Ellory Frank Schempp, Roger Wade Schempp, and Donna Kay Schempp, residing in Montgomery County, Pennsylvania.

(2) All of the defendants reside or are located within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania.

(3) Minor plaintiff Ellory Schempp was a student at Abington Senior High School at the time this action was brought but graduated therefrom prior to the trial of this action.

(4) Minor plaintiff Roger Schempp was an eighth grade student in the Huntingdon Junior High School, Abington Township, during the academic year end-

ing 1958 and he is presently a student in said school.

(5) Minor plaintiff Donna Schempp was a seventh grade student in the Huntingdon Junior High School, Abington Township, during the academic year ending 1958 and she is presently a student in said school.

(6) In each of said schools attended by the minor plaintiffs there is an opening period each day observed by the reading of ten verses of the Bible.

(7) The reading of the Bible as aforesaid each day is followed by a standing recitation in unison of that portion of the New Testament known as the Lord's Prayer.

(8) The attendance of all students in both of the aforesaid schools at the ceremony of the Bible reading and recitation of the Lord's Prayer is compulsory.

(9) The practice of the daily reading of ten verses of the Bible in the public schools of Abington Township constitutes religious instruction and the promotion of religiousness.

(10) The practice of the daily reading of ten verses of the Bible together with the daily recitation of the Lord's Prayer in the public schools of Abington Township is a religious ceremony.

### Conclusions of Law.

(1) The court has jurisdiction of the parties and the subject matter of this litigation under Sections 1343, 2281, Title 28 United States Code. The instant three-judge court was properly convened pursuant to Section 2284, Title 28, United States Code and has before it substantial federal questions for adjudication.

(2) The practice of reading ten verses of the Bible each day in the public schools of Abington Township is pursuant to the mandatory provisions of Section 1516 of the Pennsylvania Public School Code of March 10, 1949, as amended.

(3) Section 1516 of the Pennsylvania Public School Code of March 10, 1949, as amended, violates the First Amendment to the United States Constitution as applied to the states by the Fourteenth Amendment in that it provides for an establishment of religion.

(4) Section 1516 of the Public School Code of March 10, 1949, as amended, violates the First Amendment to the United States Constitution as applied to the states by the Fourteenth Amendment in that it interferes with the free exercise of religion.

(5) The combined practice of Bible reading and mass recitation of the Lord's Prayer by students in the public schools of Abington Township violates the First Amendment to the United States Constitution as applied to the states by the Fourteenth Amendment in that said practice constitutes an establishment of religion and an interference with the free exercise of religion.

A decree will be entered enjoining the practices complained of, in accordance with this opinion, and declaring Section 1516 of the Public School Act of March 10, 1949, as amended, 24 P.S.Pa. § 15–1516, unconstitutional.