577 F.2d 311
 Marvin MELTZER, Individually and as father and next friend
of David Meltzer, et al., Plaintiffs-Appellants,
v.
BOARD OF PUBLIC INSTRUCTION OF ORANGE COUNTY, FLORIDA, etc.,
et al., Defendants-Appellees.
 No. 75-1423.
 United States Court of Appeals,
Fifth Circuit.
 July 31, 1978.
 
 Jerome J. Bornstein, Orlando, Fla., for plaintiffs-appellants.
 William M. Rowland, Jr., John W. Bowen, Orlando, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before BROWN, Chief Judge, TUTTLE, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL and FAY, Circuit Judges.
 PER CURIAM:
 
 
 1
 The panel decision, Meltzer v. Board of Public Instruction of Orange County, Florida, 5 Cir., 1977, 548 F.2d 559, rehearing en banc granted, 553 F.2d 1008, sets out the factual and procedural posture of this lawsuit. The Court en banc considered the following issues: (1) whether the District Court correctly denied relief on the constitutional challenge to the Orange County school board's resolution requiring daily morning devotionals of Bible reading and prayer in the public schools;[1] (2) whether the District Court correctly denied relief on the constitutional challenge to the Orange County school board's guidelines for the distribution of religious literature at designated locations on the school premises;[2] (3) whether the District Court's denial of relief on the constitutional challenge to Fla. Stat. Sec. 231.09(2) (the "Christian virtue" statute which requires teachers to inculcate Christian virtues in their students) presents a case or controversy.[3] The Court en banc adopts the portion of the panel opinion which reverses the District Court on issue (1) and which holds the morning devotional unconstitutional. The Court en banc affirms by an equally divided vote the District Court's holding on issues (2) and (3).[4]
 
 
 2
 See, e. g., School Board of City of Richmond v. State Board of Education, 1973, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771; Rice v. Sioux City Cemetery, 1954, 348 U.S. 880, 75 S.Ct. 122, 99 L.Ed. 693, on rehearing, 1955, 349 U.S. 70, 73, 75 S.Ct. 614, 99 L.Ed. 897; United States v. Holmes, 5 Cir., 1976, 537 F.2d 227; Carter v. United States, 5 Cir., 1963, 325 F.2d 697, cert. denied, 1964, 377 U.S. 946, 84 S.Ct. 1353, 12 L.Ed. 308; 5 Am.Jur.2d, Appeal and Error, Sec. 902, pp. 338, 339.
 
 
 3
 REVERSED IN PART: AFFIRMED IN PART.
 
 
 4
 JOHN R. BROWN, Chief Judge, with whom TUTTLE, GOLDBERG, GODBOLD and LEWIS R. MORGAN, Circuit Judges join, dissenting in part:
 
 
 5
 For reasons set out in the panel's decision and amplified here, I must respectfully dissent as to issues (2) and (3).
 
 
 6
 With its equally divided vote affirming the District Court the en banc Court today reaches an extraordinary result and countenances activity which harms the principles of religious liberty embodied in the Constitution and rooted firmly in our Nation's heritage. The distribution of religious literature, particularly massive quantities of one faith's sacred scripture, through the public schools to impressionable children advances religion and encourages excessive government entanglement with religion in contravention of the Establishment Clause.[1] Similarly, Fla.Stat. § 231.09(2)[2] which in mandatory terms directs teachers to inculcate "Christian virtues" in their young pupils is unconstitutional. Although a poorly developed and occasionally sparse record plagues this case, the uncontradicted portions of the record and the facts as set out in the panel decision below, 548 F.2d 559, amply delineate the existence of constitutional transgression.
 
 I. Meltzer Mise-en-scene
 
 7
 A brief summary of the facts of this case reveals that the equally divided en banc Court's decision is plainly at odds with the First Amendment's principles of religious freedom. On August 24, 1970, the Orange County Board of Public Instruction held a meeting at which a member of the Gideon Camp asked permission to distribute Gideon Bibles to the students at the public schools. The request was approved. At this meeting the Board also adopted a resolution calling for a five to seven minute morning exercise in every school to consist of prayer and Bible reading. At the next meeting of the Board, on September 15, 1970, the eventual plaintiffs in this case complained to the Board that the morning exercise devotional and the distribution of Gideon Bibles violated their religious rights.
 
 
 8
 At a third meeting of the Board, counsel for the Board gave his opinion that the morning exercises were not unlawful. To support his opinion counsel cited Chapter 231.09(2) of the Florida Statutes.[3] The Board thereupon refused to modify its policy regarding opening day exercises. The morning exercise program was found to be unconstitutional by the panel and this result is affirmed by the en banc Court. Notwithstanding this affirmance of the panel, the unconstitutional morning devotional is relevant here to the extent it implicates the Florida "Christian virtue" statute and to the extent it reflects the general predilection of the Board to encourage an institutionalized form of religion in the public schools.
 
 
 9
 Following this third meeting, on October 7, 1970, the Board did issue guidelines for the distribution of Bibles or other religious literature.[4] Prior to the issuance of the guidelines, groups of Gideons would go from classroom to classroom walking up and down the aisles distributing Bibles to those students who indicated they would like one. In this fashion 15,000 Bibles were distributed to the school children during class.
 
 
 10
 The October 7th guidelines were designed ostensibly to quell the religious minorities' cries of protest. Under the guidelines a location within the school facilities would be designated for the distribution of religious literature supplied by outside groups. The guidelines, however, applied only to religious literature, and permitted the periodic announcement to the pupils that the literature was available. No similar invitation was issued to other pressure interest groups such as the United States Chamber of Commerce, N.A.A.C.P., AFL-CIO, Ripon Society, Americans for Democratic Action or others who have a legitimate interest in advancing their causes through the capture of young minds. The guidelines were adopted nine days before the lawsuit was filed.
 
 
 11
 Although the guidelines might appear as a concession to the religious minorities by allowing all religions to distribute literature, as applied only the Gideons took advantage of the arrangement. More importantly, they took advantage of the guidelines to the tune of 33,000 additional Bibles distributed after adoption of the guidelines. Apparently the distribution was made at locations highly visible to the students, such as cafeterias, by the Gideons themselves.[5] Finally, it is unclear whether the Board's January 14, 1971 Compliance Statement[6] which restricted distribution to school libraries has been implemented.
 
 
 12
 Today's decision jeopardizes fundamental First Amendment values. As Justice Clark, speaking for the Supreme Court in School District of Abington Township v. Schempp, 1967, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844, 858, recognized, history teaches "that powerful sects or groups might bring about a fusion of governmental and religious functions or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits." The Board's October 7 guidelines unjustifiably encroach upon this long-accepted notion of the First Amendment's guarantee of religious liberty.
 
 
 13
 Our decision today permits young, impressionable students to receive influential dosages of one group's beliefs through repeated and massive distribution of the Bible. The children cannot help but view the school system's formal tolerance of such distribution as the placement of the community's imprimatur on this particular movement and all that it embodies. This is precisely what the Establishment Clause prohibits. One does not need to be a prophet to realize that after this Court's holding today some children in Florida schools will be coerced, pressured, or influenced into accepting one faith over others not as fortunate to receive state approval.
 
 
 14
 The Court's decision allows outsiders to influence the theological beliefs of pupils through subtle and unchecked efforts to proselytize. Although the constitutional obligation of separation of church and state is not so narrow a channel that the slightest deviation from a straight course leads to condemnation, here the course is well charted by precedent. We turn now to examine and apply the jurisprudential themes which underlie the Establishment
 
 
 15
 Clause and which envelop this controversy. II. The
 
 
 16
 Constitutionality Of The 1970 Guidelines For The
 
 Distribution Of Religious Literature In
 Public Schools
 
 17
 Each state effort to promote or accommodate religion is measured against a three-tiered Establishment Clause standard. To pass muster under the Constitution the state action[7] in question must reflect a clearly secular purpose, have a primary effect that neither advances nor inhibits religion, and avoid excessive government entanglement with religion. Wolman v. Walter, 1977, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714; Roemer v. Maryland Public Works Board, 1976, 426 U.S. 736, 748, 96 S.Ct. 2337, 49 L.Ed.2d 179; Meek v. Pittenger, 1975, 421 U.S. 349, 358, 95 S.Ct. 1753, 44 L.Ed.2d 217; Committee for Public Education and Religious Liberty v. Nyquist, 1973, 413 U.S. 756, 773, 93 S.Ct. 2955, 37 L.Ed.2d 948.[8] The Supreme Court views these criteria as "guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired." Tilton v. Richardson, 1971, 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790; Nyquist, supra, 413 U.S. at 773 n.31, 93 S.Ct. at 2965 n.31, 37 L.Ed.2d at 963 n.31.[9]
 
 A. The Purpose Of The Guidelines
 
 18
 An examination of the record reveals that the Bible distribution guidelines fail to reflect a secular purpose. First, on their face the guidelines, entitled "Religious Books and Literature," apply solely to the distribution of religious literature, and expressly do not apply to the distribution of secular literature.[10] Moreover, after initially approving the Gideons' request to distribute Bibles in the classroom, the Board adopted its October 7, 1970 guidelines only nine days before the eventual plaintiffs ceased their numerous and unheeded complaints to the Board and brought this lawsuit. The record is also void of any indication that any other religious group ever approached the Board for distribution privileges or ever utilized the distribution system adopted by the guidelines. Accordingly, the guidelines necessarily facilitated the Gideons' efforts at distribution in the schools.
 
 
 19
 More significantly, the Board's pattern of conduct highlights the primarily sectarian purpose which underlies the guidelines. This is not the first attempt by the Orange County school board to accommodate religion, particularly the Gideon movement, in its public schools. In a challenge to an earlier Board authorization of Gideon Bible distribution, the Florida Second District Court of Appeals indicated that Bible distribution could not constitutionally be permitted. Brown v. Orange County Board of Public Instruction, 1960, Fla.App., 128 So.2d 181. Notwithstanding such notice of the potential constitutional infirmity inherent in any Bible distribution scheme, the Board again in 1970, prior to its adoption of the 1970 guidelines (see note 4, supra ), readily renewed this questionable practice. With the Board's permission, groups of Gideons descended on classrooms and roamed the aisles distributing Bibles to those children who indicated they would like one. At the en banc oral argument the counsel for the Board acknowledged that this form of distribution was clearly unconstitutional. Thus, despite the earlier state court ruling the Board, with no discussion, approved a highly questionable and later admittedly unconstitutional scheme.
 
 
 20
 The Board's conduct subsequent to the promulgation of the guidelines similarly evinces the nonsecular basis of the guidelines. For example, plaintiff's December 10, 1970 interrogatory No. 5 requested a variety of relevant information about the implementation of the Board's guidelines.[11] The Board's answer of February 1, 1971 stated that "no principal has responded that he has implemented the guidelines." Because the Board acknowledged that thousands of Bibles had been distributed following adoption of the guidelines, this curt response tends to show that the Board failed to make any conscientious effort to enforce the guidelines or to even give an adequate answer to the interrogatory. Furthermore, there exists no indication that the Board's Statement of Compliance of January 13, 1971, which modified the guidelines by limiting distribution to the libraries, was ever complied with, enforced, or even circulated.[12] In fact, evidence at the March 8, 1971 compliance hearings indicated that Bible distribution may not have been limited to the libraries. By a deposition incorporated in the record at the compliance hearing, Mr. Considder, the Bible Secretary of the Gideon Camp, testified that distributions had occurred in areas such as school picnic grounds and school cafeterias.[13]
 
 
 21
 Finally, the record reveals that the Gideon Camp again, on two separate occasions in August and September 1973, clearly after issuance of the 1970 guidelines, requested permission to distribute Bibles in the schools. The Board tabled the request by a 4-3 vote to await counsel's legal opinion on the outcome of this litigation. Thus, despite the strong dictum issued by the District Court in an earlier order,[14] the Board apparently felt that the legality of further Bible distribution was not settled, but instead depended on the outcome of the current litigation. Consequently, this negative action demonstrated the Board's desire, or at least continued willingness, to sanction Bible distribution for particular groups or sects.
 
 
 22
 Considered as a whole the record portrays a pattern of conduct which manifests the Board's predilection to encourage particular religions and in doing so to promote most particularly the aims of the Gideon movement. In the face of rulings by both the Florida state court and the federal District Court which indicated the likely constitutional infirmity of a Bible distribution scheme, the Board's conduct exhibits a sectarian commitment to Bible distribution, sectarian in the sense that the Board thought availability of Bibles was for religious values, not, say, as instruments of good literature. Such conduct also exposes the Board's disregard for the enforcement of the guidelines themselves. It is inescapable that the Gideon campaign principally, if not exclusively, motivated the Board's promulgation of the guidelines and, correspondingly, that a primarily sectarian purpose underlay those guidelines.
 
 B. The Effect Of The Guidelines
 
 23
 The effect of the school board's guidelines is also a constitutionally proscribed one. While the Supreme Court permits accommodation of religion in certain instances, it has generally strived for more precise principles to evaluate each promotion of a religious interest. One principle began developing in Everson v. Board of Education, 1947, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, when Justice Black asserted that neither a state nor the federal government "can pass laws which aid one religion, aid all religions, or prefer one religion over another." 330 U.S. at 15, 67 S.Ct. at 511, 91 L.Ed. at 723. The nondiscrimination principle embodied within this phrase has been reaffirmed several times.[15] Torcaso v. Watkins, 1961, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982, expanded the principle, arguing that "neither a State nor the Federal Government can constitutionally . . . pass laws or impose requirements which aid all religions as against non-believers. . . ." 367 U.S. at 495, 81 S.Ct. at 1683, 6 L.Ed.2d at 987. Finally, the Supreme Court declared in Gillette v. United States, 1971, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168, that "the Establishment Clause stands at least for the proposition that when government activities touch on the religious sphere, they must be secular in purpose, evenhanded in operation, and neutral in primary impact." 401 U.S. at 450, 91 S.Ct. at 836, 28 L.Ed.2d at 181. These cases outline a non-discriminatory impact principle that requires state action to be neither facially discriminatory nor discriminatory in impact. The Orange County school board's guidelines offend this principle and thereby violate the Establishment Clause.[16]
 
 
 24
 First, the guidelines facially apply only to religious books and literature thereby discriminating between religion and nonreligion. More significant, more than just being discriminatorily selective, this shows that the guidelines were not intended to assure a source of religious works for study as literature for their literary qualities. Equally important, the guidelines expressly relate to such religious material provided or offered by outsiders. Thus, the Board has established by regulation a formalized system for the distribution of religious literature without making any similar provision for the distribution of secular literature.[17] Additionally, as applied the guidelines advance particularly the Gideon faith. Only the Gideons initially in 1970 requested permission to distribute religious literature. Only the Gideons have made repeated requests for permission to distribute religious literature. Only the Gideons have utilized the distribution scheme established by the guidelines. Finally, the guidelines are uniquely tailored to the Gideon movement which has as one of its principle missions the distribution of Bibles.
 
 
 25
 Because the guidelines, and operations thereunder, inevitably encourages proselytization both are equally vulnerable. Indeed, in its most innocent purpose, the Board intended that all faiths be given, free of cost, facilities and space together with a large group of prospective readers to compete with other faiths for the minds and wills of these children. The state was thus providing space, facilities, and most important, a large audience.[18] Moreover, with over 48,000 Bibles distributed the plain desire of the Gideons was to proselytize believers or nonbelievers into acceptance of their theological beliefs.
 
 
 26
 The conclusion that the Board's guidelines have an impermissible effect is bolstered by precedent. The leading case to consider the issue of the constitutionality of Bible distribution to public school children is Tudor v. Board of Education, 1953, 14 N.J. 31, 100 A.2d 857, 45 A.L.R.2d 729, cert. denied, 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 644. In that case the New Jersey Supreme Court held that the distribution of Gideon Bibles to public school children was unconstitutional. The Court reasoned that the "public school machinery is used to bring about the distribution of these Bibles to the children . . .. In the eyes of the pupils and their parents the Board of Education has placed its stamp of approval upon the distribution and, in fact, upon the Gideon Bible itself. . . . The school's part in this distribution is an active one and cannot be sustained on the basis of a mere assistance to religion." 14 N.J. at 51, 100 A.2d at 868, 45 A.L.R.2d at 741. The similar holdings by two other courts in Goodwin v. Cross County School District, E.D.Ark., 1973, 394 F.Supp. 417, and Brown v. Orange County Board of Public Instruction, 1960, Fla.App., 128 So.2d 181, were grounded on the Tudor rationale. In the present case the periodic announcements of the availability of the religious literature reinforces the Board's imprimatur of the Gideon Bible.
 
 
 27
 These comments are an extension of Engel v. Vitale, 1962, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601, where the Supreme Court, without the citation of a single case and with only a single dissent, struck down a New York school board's requirement that an official state nondenominational prayer be recited in the public schools at the beginning of each day. In Engel the Court found that "it is no part of the business of government to compose official prayers" and that government should "leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." 370 U.S. at 425, 435, 82 S.Ct. at 1264, 1269, 8 L.Ed.2d at 605, 610. Similarly, in the present case it is not the business of government to endorse religion by maintaining on school premises a location for the distribution of religious literature brought into the school by members who unquestionably seek to persuade others to their particular faith. The desire of these outsiders whose gifts are accepted by the school belies its impact: it is offered to persuade, to influence adoption of a faith.
 
 
 28
 C. The Church-State Entanglement Created By The Guidelines
 
 
 29
 Analysis under the third tier of the Establishment Clause standard reveals that the Board's guidelines foster an excessive government entanglement with religion. In Tilton v. Richardson, 1971, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790, an Establishment Clause case which permitted public aid to private religious universities, Chief Justice Burger's plurality opinion outlines three factors which have a relevant bearing on the analysis of the Board's guidelines. First, the Court pointed out that indoctrination is more likely where students are younger, less experienced, less skeptical, and more impressionable. The distribution efforts involved here are aimed at just such students those in elementary and secondary schools. These young children cannot help but be influenced by the school's approval of the presence of Gideon Bibles as being in itself an approval of Gideon doctrine, lest why else would the books be allowed. Second, the aid in the present case is clearly of an ideological nature the distribution of the Bible, an instrument of religion which cannot be gainsayed. Finally, the Court in Tilton warned against permitting aid of a continuing nature. In the present case the Gideons have made repeated visits to the schools and have even made a request, though tabled by the Board, to allow even further distribution efforts.
 
 
 30
 The Board may also find itself effectively defining religion or censoring the content of religious materials. With periodic announcement of the availability of each faith's literature allowed by the guidelines, the secular public school system could become the focal point for the competition of all religious beliefs. The Courts and other state officials would be under a continuing duty to make certain that one faith was not in effect being endorsed and promoted by its monopolistic use of the distribution network or by the tone or content of the school's periodic announcements. Indeed, it is ironic that the more fairly and objectively the guidelines are enforced, the more the school board will become immersed in serious religious judgments.
 
 
 31
 We hasten to add that without question a course in comparative religion would be constitutionally permissible. Nothing said above conflicts with the Supreme Court's pronouncement that "(w)hile study of religions and of the Bible from a literary and historic viewpoint, presented objectively, as part of a secular program of, need not collide with the First Amendment's prohibition, the State may not adopt programs or practices in its public schools or colleges which aid or oppose any religion." Epperson v. Arkansas, 1968, 393 U.S. 97, 106, 89 S.Ct. 266, 271, 21 L.Ed.2d 228, 236. Here, however, we are not discussing a detached academic exercise. Instead, we are discussing massive dosages of religious literature to children of an impressionable age. The First Amendment's protection of the religious liberty of these children and of all beliefs alike compels me to find the Orange County school board's Bible distribution guidelines unconstitutional.
 
 III. The Christian Virtue Statute
 
 32
 Our equally divided vote on the issue of the constitutionality of the "Christian virtue" statute of Florida, § 231.09(2) (see note 2, supra ) reflects a concern that the claim is imaginary, speculative, and of insufficient immediacy to warrant the issuance of a declaratory judgment. I have no difficulty in concluding that the "Christian virtue" statute is sufficiently implicated in the activities of the Board to wholly justify declaratory relief. First, the Board sustained its policy permitting Bible distribution, and Bible readings and prayer by relying in part upon the statute.[19] Moreover, this policy is still in effect. Finally, the statute is in mandatory terms it imposes an affirmative duty on the state's instructional personnel to inculcate Christian virtues. Although no one has been disciplined recently for noncompliance with the statute, this reflects primarily the teacher's, principal's, and Board's acceptance of the statute and its aim the inculcation of Christianity.
 
 
 33
 Having concluded that a case or controversy exists, I adhere fully to the determination by the panel below as to the unconstitutionality of the statute. I cannot improve on what I said for the panel:
 
 
 34
 We conclude that the purpose of the "Christian virtue" part of § 231.09(2) is the advancement of a particular religion. Although our research has not disclosed any illuminating legislative history which would shed light on our task, we think it of particular significance that the Florida legislature passed a statute[37] only a few years prior to its passage of the Christian virtue statute, which made Bible reading mandatory in the public schools of Florida. This statute, which immediately preceded the Christian virtue statute in the Florida statutes, remained in effect until repealed in 1965. We think it not unreasonable to suppose that the Christian virtue statute, which was made an additional subsection to the same statute as the compulsory Bible reading statute, was meant to be complementary to that statute. A consideration of the conjunction of the two statutes, together with the extremely recent repeal of the compulsory Bible reading statute, lends persuasive weight to the
 
 
 35
 theory that the Florida legislature had in mind a particular religion the Christian religion when it passed § 231.09(2).
 
 
 36
 37. This statute, passed in 1925, provided that "Members of the instructional staff of the public schools, subject to the rules and regulations of the state board and of the county board, shall perform the following functions:
 
 
 37
 Bible reading. Have, once every school day, readings in the presence of the pupils from the Holy Bible, without sectarian comment."
 
 
 38
 This statute was the original § 231.09(2). When the Christian virtue statute was passed in 1939, it became § 231.09(3). In 1965, when the compulsory Bible reading statute was repealed, the Christian virtue statute became § 231.09(2).
 
 
 39
 (22) More important, the very wording of the statute bespeaks a particular religious purpose. The Board and the State have argued very forcefully before us that the word "Christian" in the statute is a mere adjective with little or no import for the statute or its application. Under elemental rules of statutory construction, we must reject this argument.[38] The evidence below is very persuasive that the phrase, "Christian virtue" suggests a very particular type of virtue a virtue that is tied particularly to one religion, and a type of virtue that is or may be at odds with other, minority, religions' concepts of virtue. Furthermore, common sense tells us that this is so. If this statute had required the inculcation of "Jewish virtue", or "Moslem virtue", we have no doubt that the unconstitutionality of the statute would be conceded by all. We can see no forthright, honest distinction when the word "Christian" is substituted for "Jewish" or for "Moslem" in our hypothetical.
 
 
 40
 We therefore conclude that the "Christian virtue" statute has as one of its major purposes the advancement of a particular religion.[39]
 
 
 41
 39. We are unconvinced by the State's argument that "Christian virtue" is a shorthand for virtue in a general philosophical sense. If the Florida legislature had meant to achieve such an effect, they could have chosen language must better suited to the task.
 
 
 42
 38. It is an elemental rule of statutory construction that if a "statute admits a reasonable construction which gives effect to all of its provisions," a court "will not adopt a strained reading which renders one part a mere redundancy. See, e. g., United States v. Menasche, 348 U.S. 528, 538-539 (75 S.Ct. 513, 519-520, 99 L.Ed. 615)." Jarecki v. J. D. Searle & Co., 1960, 367 U.S. 303, 307-08, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859, 863.
 
 
 43
 It is also a "cardina rule of statutory construction that significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, sect. 2, it was said that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." This rule has been repeated innumerable times. Another rule equally recognized is that every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each."
 
 
 44
 Washingtn Market Co. v. Hoffman, 1879, 101 U.S. 112, 115-16, 25 L.Ed. 782, 783.
 
 Primary Effect Of The Statute
 
 45
 (23) In School District of Abington Township v. Schempp, supra, the Supreme Court held that if the primary effect of a challenged state statute is to advance or inhibit religion, then that statute must be deemed an unconstitutional violation of the First Amendment. In the case before us, the record below reveals that the Board resolution allowing Bible reading, public prayers, and Bible distribution in the public schools was passed in furtherance of, and in reliance upon, § 231.09(2). Since we have already declared these practices unconstitutional, we can only conclude that the statute upon which the resolutions ordering these practices were grounded has a primary effect of advancing Protestant religion and inhibiting other religions.
 
 
 46
 Even if we had not already found that the statute had a religious purpose, we would still declare the statute unconstitutional because of its invalid primary effect.
 
 
 47
 We also emphasize that this statute is worded affirmatively.[40] It requires teachers to perform certain tasks "Members . . . shall perform the following functions: . . . embrace every opportunity to inculcate, by precept and example, . . . the practice of every Christian virtue." (Emphasis supplied). Given the mandatory wording and the specific instruction that it is to be "Christian " virtue which is inculcated, then the practical effect of the statute is much more likely to be the advancement or inhibition of religion than if the statute is not mandatorily worded.
 
 
 48
 40. In Abington, supra, the Court stated that the "Free Exercise Clause, likewise considered many times here, withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion. The distinction between the two clauses is apparent a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." Id., 374 U.S. at 222-23, 83 S.Ct. at 1572.
 
 
 49
 We need not decide here, whether this statute, by its mandatory wording, violates the Free Exercise Clause as well as the Establishment Clause. We merely suggest that the presence of the mandatory wording in this statute renders the statute more constitutionally suspect, and in this case, unconstitutional, than would suggestive, non-mandatory wording.The Virtue Of The Latest If Not
 
 
 50
 We emphasize that the downfall of this statute is its use of the word "Christian" and the effect the inclusion of that word has had on the practices of the Board of Public Instruction of Orange County and the area public schools. If the statute read exactly the same, except that the word "Christian" was excised, we would probably hold the statute constitutional. As it stands now, we have measured it against the standards set by the Supreme Court for measuring whether a statute passes muster under the First Amendment, and we have found it wanting. Section 231.09(2), as currently written, is unconstitutional.
 
 
 51
 548 F.2d at 578-79.
 
 
 52
 The statute, like the Bible distribution scheme, deviates in an unconstitutional course from the First Amendment proscription against an establishment of religion, and I find both repulsive to that principle.
 
 
 53
 GEE, Circuit Judge, with whom COLEMAN, Circuit Judge, joins, concurring in part and dissenting in part:
 
 
 54
 For the reasons stated in my concurrence and partial dissent to the panel opinion, 548 F.2d 559, 579-81, I agree with the conclusion of the dissent (Part III) that the "Christian virtue" statute is unconstitutional. For the reasons also stated there, I most thoroughly disagree with both the reasoning and conclusion of the dissent that providing a place in a public school where the partizans of any faith who wish to do so may merely deposit literature to be picked up or ignored by students violates the First Amendment. To advance such notions in the name of defending religious liberty is to make a desolation and call it peace, to suggest that all competing ideas may have their day in the marketplace except religious ones.
 
 
 55
 It is very plain that the Founders had no such thing in mind, see generally Berns, The First Amendment and the Future of American Democracy 1-32 (Basic Books, Inc., 1976). I am surprised that my dissenting Brothers feel their views sufficiently advanced beyond the Founder's conceptions to mandate, confidently if for today ineffectually, a general extirpation by prior restraint of all religious ideas from the milieu where most children spend most of their waking hours and acquire most of their ideas.
 
 
 
 [1]
 See the panel's discussion of this issue, 548 F.2d at 572-74
 
 
 [2]
 Id. at 572, 574-76
 
 
 [3]
 Id
 
 
 [4]
 Id. at 572, 576-79
 
 
 [1]
 The First Amendment of the Constitution begins:
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .
 
 
 [2]
 Chapter 231.09(2) of the Florida Statutes provides:
 
 
 [231]
 09 Duties of instructional personnel. Members of the instructional staff of the public schools, subject to the rules and regulations of the state board and of the school board, shall perform the following functions:
 (2) Example for pupils. Labor faithfully and earnestly for the advancement of the pupils in their studies, deportment and morals, and embrace every opportunity to inculcate, by precept and example, the principles of truth, honesty and patriotism and the practice of every Christian virtue.
 (Emphasis added).
 
 
 [3]
 See note 2, supra
 
 
 [4]
 TO:
 ALL ORANGE COUNTY PUBLIC SCHOOL PRINCIPALS
 FROM:
 JAMES M. HIGGINBOTHAM
 District Superintendent
 SUBJECT:
 RELIGIOUS BOOKS AND
 LITERATURE
 The following guidelines have been developed by the School Board Attorneys and apply to the handling of religious books, doctrine, or literature which may be offered to the schools for distribution. These guidelines are to be reviewed by you in detail and are to receive immediate implementation.
 The procedures as contained in the attached guidelines are the only procedures authorized by this office and shall be the sole method of handling material of this nature.
 GUIDELINES
 The following are guidelines for the principals of the Orange County District School Board schools for handling of religious books or doctrine offered to the schools for free distribution. We emphasize that we are directing these guidelines only toward religious books and doctrine not intending to modify general present policies or guidelines with regard to other literature.
 
 
 [1]
 A place be designated within the school facility for all religious books and literature which may be supplied by outside groups or organizations
 
 
 [2]
 Books and literature be available to the students only at the designated location
 
 
 [3]
 All faiths be allowed to provide books and literature under the terms of these guidelines
 
 
 [4]
 No distribution nor allowing of distribution of books and literature be undertaken through the classroom, homerooms, in assembly or on any portion of school property by the staff, students or outsiders
 
 
 [5]
 Periodic announcements may be made that literature is available at the designated place
 
 
 [6]
 No school employee may comment upon the decision by any group to make available or not make available literature, the content of such literature, or in any way influence others concerning the literature or concerning the taking or reading of the literature
 
 
 [5]
 See the discussion regarding the lack of clarity in the record at note 13, infra
 
 
 [6]
 Point 3 of the Statement of Compliance stated that:
 
 
 [3]
 Acting in the spirit of community harmony, defendants will place all religious literature which may be made available to the Orange County school system only in the libraries of the schools
 The plaintiffs filed a Statement of Noncompliance in response to the Board's Statement of Compliance.
 
 
 [7]
 The Orange County Board of Public Instruction acted in its official capacity under state law. See Engel v. Vitale, 1962, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601
 Furthermore, at the en banc oral argument counsel for the school board conceded that the Board's Bible distribution guidelines remain in effect and that an ongoing controversy exists as to the constitutionality of those guidelines.
 
 
 [8]
 The tripartite standard is the appropriate analytical framework from which to evaluate the Board's guidelines for the distribution of religious literature because it represents the "product of considerations derived from the full sweep of the Establishment Clause cases." Nyquist, supra, 413 U.S. at 772, 93 S.Ct. at 2965, 37 L.Ed.2d at 962
 
 
 [9]
 In Nyquist, supra, Justice Powell pointed out that "(m)ost of the cases coming to this Court raising Establishment Clause questions have involved the relationship between religion and education. Among these religion-education precedents, two general categories of cases may be identified: those dealing with religious activities within the public schools, and those involving public aid in varying forms to sectarian educational institutions." 413 U.S. at 772, 93 S.Ct. at 2965, 37 L.Ed.2d at 962. This case falls in the former category which contains, as cited by Justice Powell, the following relevant cases: Zorach v. Clauson, 1952, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 ("release time" from public education for religious education); Engel v. Vitale, 1962, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (prayer reading in public schools); School District of Abington Township v. Schempp, 1963, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (Bible reading in public schools); Epperson v. Arkansas, 1968, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (anti-evolutionary limitation on public school study). Consequently, the principles embraced by these decisions in particular shape the evaluation of the constitutionality of the Bible distribution guidelines
 
 
 [10]
 See note 4, supra, for the text of the guidelines
 
 
 [11]
 Interrogatory No. 5. In accordance with Defendants' guidelines as set forth in Exhibit F (see note 2, supra ) attached to the Complaint, as to each school facility, please state:
 (a) What place or places in each school facility has been designated?
 (b) Have any "religious books, doctrine or literature" been offered for distribution since October 7, 1970, and, if so, please describe the contents thereof fully?
 (c) Have any "religious books, doctrine or literature" been distributed to public school students since October 7, 1970, and, if so, please state what was distributed, when, where and to whom such distribution was made?
 (d) Have any periodic announcements of distribution of "religious books, doctrine or literature" been made since October 7, 1970, and, if so, please state when, by whom, what was said, and how such announcement was made.
 
 
 [12]
 See note 6, supra
 
 
 [13]
 The precise period over which distributions occurred is unclear from the record. Although Mr. Considder testified that 48,000 Bibles were distributed "within a four week total period" from the time the Gideons were initially given permission to distribute Bibles on August 24, 1970, this is at variance with other portions of his testimony. Mr. Considder testified that 15,000 Bibles were distributed through the classroom prior to the promulgation of the October 7, 1970 guidelines and that an additional 33,000 Bibles were distributed after the adoption of the guidelines. But the guidelines were adopted more than six weeks after the Gideons' initial request was approved. Thus it is unclear from the record within what period of time the 33,000 Bibles were distributed and whether the distribution at non-library locations occurred after the issuance of the compliance statement. Determination of the precise period during which the Bibles were distributed, however, does not affect the conclusion that the guidelines themselves are unconstitutional. Instead, a determination that the Board ignored its own compliance statement further demonstrates the Board's willingness to facilitate Bible distribution
 
 
 [14]
 The order of December 4, 1970 denied a temporary restraining order on the grounds that the plaintiffs had failed to adduce sufficient evidence to show the possibility of irreparable injury, or to make findings of fact as to the Bible distribution. In strong dictum, however, the District Court pointed out that the earlier Florida case, Brown v. Orange County Board of Public Instruction, Fla.App.1960, 128 So.2d 181, could be read to prohibit distribution of Bibles in the schools
 
 
 [15]
 E. g., Epperson v. Arkansas, 1968, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228; School District of Abington Township v. Schempp, 1963, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844
 
 
 [16]
 For an informative distillation of the major Supreme Court Establishment Clause themes see the discussion in Comment, 62 Va.L.Rev. 237 (1976)
 
 
 [17]
 The record sheds no light on Board policies concerning the distribution of secular literature that was provided or offered to the school by outsiders. At the en banc oral argument counsel for the Board acknowledged that he would be "troubled" if the Board had not made similar guidelines for the distribution of secular literature. According to counsel the absence of similar regulations would tend to show Board favoritism of religion. Counsel, even though "troubled," informed the Court that he had made no effort to determine what policies the Board entertained as to the distribution of outside secular literature. Thus, counsel could not tell the Court whether there existed designated tables or places for the distribution of secular materials
 
 
 [18]
 Furthermore, Mr. Considder's testimony, note 13, supra, also revealed that Gideons themselves manned the designated distribution locations. The irresistible temptation for proselytizing, even subtly so, by the Gideons who man the distribution points cannot be underestimated
 
 
 [19]
 In an opinion letter dated September 28, 1970 counsel for the Board stated that such policy "aids school officials to carry out their specific duties set forth in § 231.09 . . . ."